**SAWYER TRANSPORT, INC.,**
**Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**No. 77-1081.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1977.

Decided Nov. 7, 1977.

Stephen H. Loeb, Chicago, Ill., for petitioner.

Thomas P. Sullivan, U. S. Atty., Chicago, Ill., Barry Grossman, Peter L. De La Cruz, Attys., Dept. of Justice, Washington, D. C., for the U. S.

John J. McCarthy, Jr., Atty., I. C. C., Washington, D. C., for I. C. C.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and KUNZIG, Judge.*

PELL, Circuit Judge.

Petitioner, Sawyer Transportation, Inc. (Sawyer), requests us to review and set aside an Interstate Commerce Commission (ICC) order which denied Sawyer's application for a certificate of public convenience and necessity as a motor common carrier.[1]

---

* Judge Robert L. Kunzig of the United States Court of Claims is sitting by designation.

1. Section 207(a) of the Interstate Commerce Act, 49 U.S.C. § 307(a), provides in part:

. . . a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to

Sawyer applied for this certificate to obtain authority to transport flat glass from the plantsite and warehouse of Guardian Industries (Guardian), located in Carleton, Michigan, to points in seven western states. Guardian manufactured in excess of 600,000 tons of raw flat glass annually in Carleton, of which approximately 7,200 tons were shipped to the seven destination states involved in this matter. Guardian at the time shipped to these seven western states via trailer on flat car (T.O.F.C., or more commonly, piggyback) rail service, and proposed to shift at least 75% of this rail traffic to motor carrier service.

Perrysburg Trucking Company, Inc. (Perrysburg) was a motor contract carrier[2] serving Guardian under a contract which required Guardian to guarantee Perrysburg 50 tons of freight per year. Guardian had been exceeding its tonnage obligation under this contract with shipments to destinations within a 400 mile radius of Carleton. Perrysburg protested Sawyer's application alleging that it, Perrysburg, was authorized to transport glass from the Guardian plant to all points in the continental United States as a contract carrier, and that it had advised Guardian that it was willing and able to handle Guardian's traffic to the seven western states, and was willing to acquire whatever additional equipment necessary to handle the traffic.

The ICC denied Sawyer's application in an order issued on May 7, 1976. No finding or statement in the order indicated that the ICC had considered the possible benefits of increased competition that might result from granting the application. Indeed, nothing in the entire record suggested that the ICC had considered the issue of competition. The denial order instead recited various facts pertaining to the adequacy of

Perrysburg's service and Perrysburg's willingness and ability to handle the proposed traffic. On December 1, 1976, Sawyer's petition for reconsideration was summarily denied by the ICC, and on April 15, 1977, the ICC denied Sawyer's petition for further hearing. Sawyer filed its action in this court naming the ICC and the United States as separate respondents.[3]

In its petition for review, Sawyer alleged that the ICC's decision denying Sawyer's application for a certificate of public convenience and necessity was arbitrary, capricious, unsupported by substantial evidence, and not in accordance with law.

I.

■ Sawyer's first argument, that the ICC's order denying Sawyer a certificate of public convenience and necessity is arbitrary, capricious, and unsupported by substantial evidence, is based upon the assertion that the decision is inconsistent with prior ICC decisions in which the ICC had granted certificates in factual situations similar to that of the instant case. We reject this argument for three reasons. First, the decisions Sawyer cites as analogous cases in which the ICC granted certificates are distinguishable from the instant case, second, our scope of review is narrow and does not permit us to reverse simply because the ICC decision may, under one interpretation, be inconsistent with prior ICC decisions, and third, longstanding ICC policies support the instant decision.

■ The decisions Sawyer cites as analogous cases in which the ICC granted certificates are *Rayfield Contract Carrier Application,* 21 M.C.C. 214 (1939); *Northern Truck Line, Inc., Ext.,* 28 M.C.C. 200 (1941); *Quality Milk Service, Inc., Ext.,* 64 M.C.C. 5 (1955); *Park Trucking and Supply, Inc.,*

---

perform the service proposed . . . ., and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied . . . .

2. A motor contract carrier is limited to serving only those shippers with whom it has continuing contracts. 49 U.S.C. § 303(15).

3. The ICC was named as a separate respondent pursuant to 28 U.S.C. § 2348 and Rule 15(a) of the Federal Rules of Appellate Procedure. The United States was named as a respondent pursuant to 28 U.S.C. § 2344. The United States, although a named respondent, filed a brief in support of petitioner Sawyer's position.

*Ext.,* 68 M.C.C. 343 (1956); *Mazzillo Contract Carrier Application,* 94 M.C.C. 563 (1964); and *Navajo Freight Lines, Inc., Ext.,* 95 M.C.C. 551 (1964). The principle relied upon in this line of cases is that the mere opposition of a contract carrier is not sufficient to bar the issuance of a certificate to a competing common carrier. In all of these cases, however, as distinguished from the present case, the protesting contract carrier did not have an existing contract with the particular shipper. In the instant case, Perrysburg, the protesting contract carrier, had an existing contract with Guardian and had a record of providing satisfactory service under its contract. Furthermore, Perrysburg had authority to serve Guardian throughout the United States so long as it served under a continuing contract.

■ The importance of this distinction depends on the policy underlying the ICC's decisions. If the policy is that a shipper should not be forced to contract with a specific contract carrier regardless of whether the shipper receives satisfactory service from the carrier under other contracts, then the distinction is unimportant, and the instant case is a departure from the *Rayfield* line of cases. If, on the other hand, the unexpressed policy underlying the ICC's decisions is that a shipper should not be forced to contract with a specific contract carrier with whom the shipper has never dealt, and with whom the shipper has had no experience of satisfactory service, the distinction is critical and fully justifies the decision in the instant case. Because the scope of our review is narrow, we cannot speculate as to ICC policy, and base a reversal on such speculation. The decision in the instant case, under at least one interpretation of ICC policy, does not depart from ICC precedent, and thus is not arbitrary or capricious. As the Supreme Court

stated in discussing the proper scope of review for agency actions, "[w]hile we may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citations omitted).

■ In any event, we must reject Sawyer's argument because the restrictiveness of our scope of review does not permit us to reverse an ICC action merely because the decision arguably may be inconsistent with prior ICC decisions. The decision of whether an applicant should be granted a certificate of public convenience and necessity is generally one for the ICC, and its decision in one case "need not be perfectly consistent with decisions in other cases." *Akers Motor Lines, Inc. v. United States,* 352 F.Supp. 606, 609 (W.D.N.D.1973), *citing Virginian Railway v. United States,* 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463 (1926). *See also Accelerated Transport-Pony Express, Inc. v. United States,* 227 F.Supp. 815, 821 (D.Vt.1964); *Wilson v. United States,* 114 F.Supp. 814, 818 (W.D.Mo.1953).

Finally, we reject Sawyer's argument because longstanding ICC policies support the decision, and thus the decision is not arbitrary or capricious. The ICC has stated consistently that existing carriers are entitled to all traffic that they can handle economically and efficiently within the scope of their operating authority, and unless such carriers are unwilling or unable to meet the public's reasonable transportation needs within their authorized territories, no new competing service should be authorized.[4] *Peerless Stages,* 86 M.C.C. 109, 119

4. This consistent position of the ICC, particularly in the light of the limited scope of our review, also causes us to reject what might appear to be at first blush a plausible basis of support for Sawyer's *Rayfield* argument. In its brief, the ICC emphasized that the present case does not involve a situation in which there was no existing contract with the protesting con-

tract carrier. Nevertheless, the ICC decision in one respect is forcing a new contract provision in that Guardian has been fulfilling its contractual obligation to Perrysburg to ship via it 50 tons of freight per year. This aspect of the situation when considered in the perspective of the Perrysburg contract including the seven western states in its authorized territory is in-

(1967). *See also Mobile Home Express, Ltd., Ext.,* 112 M.C.C. 765 (1971); *Connell Transport Company, Ext.,* 91 M.C.C. 113, 123 (1962); *Lawrence Ext.,* 79 M.C.C. 73, 76 (1959); *P. B. Mutrie Motor Transport Inc., Ext.,* 76 M.C.C. 171, 173 (1958). In the instant case, substantial evidence indicates that Perrysburg, the existing contract carrier, is willing and able to handle the proposed new traffic efficiently.

## II.

 Sawyer's second argument in this petition for review is that the ICC's order denying Sawyer a certificate of public convenience and necessity is not in accordance with law, because the ICC failed to consider the possible public benefits of increased competition that might result from granting the application. The Department of Justice filed a brief on behalf of the United States in this case supporting Sawyer, and on this issue asserted that the ICC's decision rested solely on the adequacy of the existing service. It joined Sawyer in alleging that the adequacy of existing service is only one element to be considered and that the ICC must consider whether additional competition would serve the public convenience and necessity. We agree. The National Transportation Policy was made part of the Interstate Commerce Act in 1940. The Act states in pertinent part:

It is hereby declared to be the national transportation policy of the Congress . . . to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices . . . . .

49 U.S.C. preceding § 1. The ICC must strive to promote this policy in the exercise of its duty of granting certificates of public convenience and necessity. It must exer-

cise this duty by "weigh[ing] the competing interests and arriv[ing] at a balance that is deemed 'the public convenience and necessity,'" *Bowman Transportation, supra* 419 U.S. at 293, 95 S.Ct. at 446, in the light of the National Transportation Policy. This process of weighing competing interests cannot, by definition, be accomplished by merely considering the adequacy of the existing service. *See, e. g., Chickasaw Motor Line, Inc., Ext.,* 121 M.C.C. 476, 479 (1975); *Arrow Trucking Co., Ext.,* 121 M.C.C. 485, 488 (1975); *Patterson, Ext.,* 111 M.C.C. 645, 650 (1970). In a case such as the instant case, we adopt the reasoning and position of the Court of Appeals for the District of Columbia Circuit as expressed in *P. C. White Truck Line, Inc. v. Interstate Commerce Commission,* 551 F.2d 1326 (D.C.Cir. 1977). In that case, the court, in reviewing an ICC order which denied a motor carrier's application for a certificate of public convenience and necessity, reversed and remanded because the ICC had failed to consider competition as a factor worthy of attention. The court alluded to several decisions in which courts have recognized the relevance of increased competition, *id.* at 1328 n. 13, and quoted the Supreme Court's declaration that:

[a] policy in favor of competition embodied in the laws has application in a variety of economic affairs. Even where Congress has chosen Government regulation as the primary device for protecting the public interest, a policy of facilitating competitive market structure and performance is entitled to consideration.

*Id.* at 1328, *quoting Bowman Transportation, supra* 419 U.S. at 298, 95 S.Ct. 438. The possible public benefit from increased competition cannot be ignored in circumstances such as we have before us in which denial of an application, in essence, grants a monopoly to the existing contract carrier. The ICC, of course, is entitled to conclude that the benefits of increased competition in a given case are overridden by other interests. *See Bowman Transportation, su-*

sufficient, in our opinion, to override the clearly stated policy as stated in the text dealing

with the third prong of our rejection of Sawyer's first argument.

*pra* at 298, 95 S.Ct. 438. Thus, we express no opinion regarding whether, in light of the competition factor, the ICC should grant Sawyer's application for a certificate. This decision we leave to the expertise of the ICC. Our concern is only that the ICC weigh the competition factor. The case is remanded to the ICC for consideration of the contribution that increased competition might make to the public weal.

REVERSED AND REMANDED.