KAISER ALUMINUM & CHEMICAL
CORPORATION, Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 79–1886.

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1980.

Decided July 7, 1981.

Donald F. Turner, Washington, D. C., for petitioner.

March Coleman, F. T. C., Washington, D. C., for respondent.

Before FAIRCHILD, Chief Judge, BAUER, Circuit Judge and BAKER, District Judge.*

* The Honorable Harold A. Baker, United States District Judge for the Central District of Illinois, is sitting by designation.

BAKER, District Judge.

The petitioner, Kaiser Aluminum & Chemical Corporation (Kaiser), seeks review of a cease and desist order issued in 1979 by the respondent, Federal Trade Commission (Commission). The order directs Kaiser to divest itself of all the assets, title, properties, interest, rights, and privileges which Kaiser obtained from a 1974 acquisition of the Lavino Division (Lavino) of International Minerals & Chemicals Corporation (IMC). We are asked to set aside that order.

The Commission based its order on conclusions that the acquisition of Lavino by Kaiser might substantially lessen competition in a national market and submarkets for basic refractories and, as a further result, would be an unfair method of competition. The Commission's ruling, therefore, finds a violation of § 7 of the Clayton Act, 15 U.S.C. § 18 (1976),[1] and a violation of § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1976).[2] The full report of the proceedings before the Commission appears at 93 F.T.C. 764 (1979).

Jurisdiction to review the Commission's order is given by 15 U.S.C. §§ 21(c) and 45(c).[3] Since the acquisition of Lavino was consummated at the headquarters of IMC in Illinois and since one of the refractory plants acquired was located in Gary, Indiana, jurisdiction is properly vested in this court.

Both Kaiser and the Commission agree that there are two issues presented for review. Those issues are:

I. Did the Commission properly define the relevant markets within which to measure the effect upon competition of Kaiser's acquisition of Lavino?

II. Did the Commission apply proper legal standards in concluding that, within the markets defined by the Commission, Kaiser's acquisition of Lavino might substantially lessen competition in violation of § 7 of the Clayton Act?

We conclude that the Commission did not define the relevant markets properly and that correct legal principles were not applied in reaching the determination that the effect of the acquisition might be substantially to lessen competition.

*Facts*

Prior to the 1974 acquisition, Kaiser and Lavino were separately engaged in the production of refractories. Refractories are materials that are specifically resistant to the action of heat and are used in the linings of industrial furnaces and kilns. Refractories are sold in shapes or forms such as bricks or may be sold as unformed material known as specialties. Refractories are further differentiated by the chemistry of their ingredients. They are basic (alkaline) or non-basic (acidic) and are intended to correspond with the chemical character of the process with which they will be in contact in order to prevent chemical union or interaction. Refractory linings are consumed over a period of time through wear.

1. § 7 of the Clayton Act states in relevant part:
 No corporation ... subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation also engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.
 15 U.S.C. § 18 (1976).

2. § 5 of the Federal Trade Commission Act states in relevant part:
 Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.
 The Commission is empowered and directed to prevent persons, partnerships, or cor-

porations ... from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.
15 U.S.C. § 45(a) (1976).

3. The target of a cease and desist order may:
 obtain a review of such order in the court of appeals of the United States for any circuit within which such violation occurred or within which such person resides or carries on business .... [T]he court ... shall have power to make and enter a decree affirming, modifying, or setting aside the order of the commission or board, and enforcing the same to the extent that such order is affirmed ....
 15 U.S.C. § 21(c) (1976).

The primary consumer of refractories in the United States is the steel industry. Other consumers include the copper, glass, and cement industries.

Prior to its acquisition, Lavino owned production plants in Plymouth Meeting, Pennsylvania; Gary, Indiana; and Newark, California. Lavino also owned raw material producing facilities—a magnesia processing plant in Freeport, Texas and a chrome ore mine in South Africa. In the East and Midwest Lavino sold to major steel producers. In the West Lavino sold refractories to smaller copper, steel, and glass producers.

Lavino commenced business in 1887 under the name of E. J. Lavino & Co. as an importer of mineral ores for sale to the steel industry. During World War I Lavino began to manufacture refractories at its Plymouth Meeting plant. Lavino expanded its refractory manufacturing to plants in California, Indiana, and Texas during the decade 1950–1960. In 1966 the Lavino family sold the business to IMC for 26 million dollars, and the company became the Lavino Division of IMC, whose assets Kaiser acquired in 1974.

Lavino was regarded as a leader in the refractories business and had a reputation as an outstanding supplier of high quality products. Its product line, however, was limited, and Lavino concentrated on the production of refractories for use in the open-hearth method of steel production.

Until the 1960's most steel production was carried on in open-hearth furnaces. During the 1950's the basic oxygen furnace (BOF) was introduced in the steel industry as a more efficient means of steel production. The BOF consumed smaller amounts of refractories than the open-hearth furnace consumed in the production of a ton of steel, and, significantly, the BOF required its own refractories. Steelmakers could not substitute open-hearth refractories, such as those Lavino concentrated on producing, for BOF refractories.

Beginning in 1960 the open-hearth method of steel production began to decline, and the BOF began to replace the open-hearth. In 1960 BOF's produced 3 million tons of steel while open-hearth furnaces produced 86 million tons. In 1970 BOF's produced 77 million tons while open-hearth production fell to 20 million tons.

Lavino made only a half-hearted attempt to enter the BOF refractories market during the early 1960's. But after the company's acquisition by IMC, management pressed for expanded product lines to serve BOF's and electric arc furnaces. IMC increased Lavino's research and development budget, installed new production equipment, and began new marketing projects. These efforts did not meet with great success, however, and in 1970 a slump in the domestic steel industry triggered an IMC decision to leave the refractories business and dispose of Lavino. The Lavino Division embarked on a course of attrition. It deferred physical improvements, made deep cuts in expenditures, allowed its product quality to slip, closed its California plant (thereby abandoning its western market), closed its Texas magnesia plant and bought a long-term supply contract instead, and began to solicit buyers for the business. One firm, Didier-Werke of West Germany, seriously considered the purchase of Lavino but decided against it. In the fall of 1972 Kaiser began to consider the acquisition of portions of Lavino.

Kaiser is a manufacturer of aluminum and is a multinational conglomerate. Kaiser began producing refractories during World War II at three plants in California. Most of Kaiser's production went to Western open-hearth steel producers, but Kaiser also sold to cement and glass producers throughout the United States. In the 1950's Kaiser acquired refractories plants in Missouri, Ohio, Pennsylvania, and Maryland that served the glass, cement, copper, petroleum, and chemical industries. In 1956 Kaiser constructed a refractories plant in Ohio that served steelmakers.

Unlike Lavino, Kaiser had a diverse refractories line as well as the strong support of its management for further expansion into the refractories business. Kaiser had reached the limit of its capacity for production of refractories for steelmakers. Kaiser

wanted to penetrate the eastern and mid-western steel industry with a new line of refractories it had developed, and it wanted greater capacity to produce refractories for sale outside the steel industry.

On February 28, 1974, for $17 million, Kaiser purchased Lavino's Plymouth Meeting and Gary plants, most of Lavino's research and development department, and Lavino's long-term supply contract for magnesia. On April 27, 1976, the Commission issued a complaint charging that the acquisition reduced competition between Kaiser and Lavino and in the refractories industry in general; that the acquisition significantly increased concentration in the refractories industry;[4] that the acquisition significantly increased the difficulty of entry into the refractories industry; and that the acquisition strengthened the position of Kaiser in that industry.

The Administrative Law Judge found against Kaiser on the issues raised by the complaint and recommended an order of divestiture. The Commission followed that recommendation and in an order of May 17, 1979, ordered divestiture. 93 F.T.C. 855 (1979).

I. *The Commission's Market Definitions*

Definition of relevant markets is necessary in order to measure the effect upon competition of Kaiser's acquisition of Lavino. The Commission and Kaiser agree that the relevant geographic market for refractories is the United States in its entirety. The market definition dispute in this case centers on the existence of appropriate product markets and submarkets.

The Commission defined an overall product market of basic refractories. That broad classification is founded on the chemical nature of the ingredients of the refractories that are basic, or alkaline, in nature and which are employed in manufacturing processes which are also basic. Steelmaking is a chemically basic process and almost exclusively uses basic refractories.

The overall market of basic refractories was further divided by the Commission into markets for basic bricks and basic specialties. Basic bricks are solid, formed shapes, and are employed in the construction of the floors, walls, and ceilings of industrial furnaces. Basic specialties, on the other hand, are unformed, viscous substances that are used to plaster basic bricks, to repair and protect them, and to extend their useful life. Basic specialties are also used as mortar in between basic bricks when a furnace lining is first constructed. Because basic specialties are used to complement bricks, basic bricks account for a larger share of basic refractories production and consumption than do basic specialties.

The Commission went on to divide the market for basic bricks into a submarket for BOF bricks, which are used in basic oxygen furnace steelmaking, and into a submarket for conventional basic bricks, which are used in open-hearth furnaces and in other industrial processes. The Commission reached its product market definitions by concluding from the evidence that there was substantial interchangeability of use in basic refractories and that, where interchange of use was not indicated, there was sufficient cross-elasticity of supply, or production flexibility, to support the markets defined.

██ The definition of relevant markets within which to measure the effects on competition of the proposed acquisition is a question of fact. As such, the Commission's findings as to relevant markets are to be accorded great deference and are to be upheld if supported by substantial evidence. 15 U.S.C. §§ 21(e) and 45(c) (1976). *Columbia Broadcasting System, Inc. v. Federal Trade Comm'n*, 414 F.2d 974, 979 (7th Cir. 1969). *See also Beatrice Foods Co. v. Federal Trade Comm'n*, 540 F.2d 303, 308 (7th Cir. 1976); *Avnet, Inc. v. Federal Trade Comm'n*, 511 F.2d 70, 77 (7th Cir. 1975); *L. G. Balfour Co. v. Federal Trade Comm'n*, 442 F.2d 1, 11 (7th Cir. 1971).

---

4. For the increases in the markets defined by the Commission, *see* 93 F.T.C. 804–07.

■ The Supreme Court has held that the concept of economic substitution is the primary means by which to define a product market. "The outer boundaries of a product market are determined by the interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); *see Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir. 1977). The market need not be limited to products which are identical in nature. Instead, the test is loose and flexible, requiring only that the products be easily substituted in their end-use:

> What is called for is an appraisal of the "cross-elasticity" of demand in the trade. [Citations omitted.] The varying circumstances of each case determine the result. In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce," monopolization of which may be illegal.

*United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956).

■ Perhaps the clearest indication that products should be included in the same market is if they are actually used by consumers in a readily interchangeable manner. *Id.* at 399–400, 76 S.Ct. at 1009; Rosenthal, *Continental Can Revisited: Limits Upon the Breadth of a Line of Commerce in a Section 7 Case*, 14 Houston L.Rev. 973, 988–93 (1977). While interchangeability of use is a basis for a product market definition, the relevant market need not be extended to include all products that are reasonably interchangeable in their end-use. *United States v. Continental Can Co.*, 378 U.S. 441, 457–58, 84 S.Ct. 1738, 1747, 12 L.Ed.2d 953 (1964) (upholding definition of

a product market composed of glass containers and metal cans but excluding other competing containers).

■ Cross-elasticity of supply, or production flexibility among sellers, is another relevant factor to be considered in defining a product market for antitrust purposes. Although economic theory would envisage defining a market solely on the basis of cross-elasticity of supply,[5] this court has so far adhered to the view that such possibility is not meaningful. *Beatrice Foods Co. v. Federal Trade Comm'n*, 540 F.2d 303, 307 (7th Cir. 1976); *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir. 1977); *Cass Student Advertising, Inc. v. National Education Advertising Service, Inc.*, 516 F.2d 1092, 1095 (7th Cir. 1975); *L. G. Balfour Co. v. Federal Trade Comm'n*, 442 F.2d 1, 11 (7th Cir. 1971). *But cf. Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1271–74 (9th Cir. 1975); *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 914–19 (10th Cir. 1975) (production flexibility alone was sufficient to support the definition of a product market).

■ The problems of market definition are not confined to the determination of an overall product market. Within a broad product market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). *Brown Shoe* sets forth a standard test for defining product submarkets in Clayton Act § 7 cases:

> The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices,

---

5. Failure to recognize cross-elasticity of supply alone as a sufficient foundation for a market definition may be questioned as not supported by sound economics. *Spectrofuge Corp. v.*

*Beckman Instruments, Inc.*, 575 F.2d 256, 280 n. 79 (5th Cir. 1978) *quoting* R. Posner, Antitrust 441 (1974); II P. Areeda & D. Turner, Antitrust Law ¶ 521a at 352 (1978).

sensitivity to price changes, and specialized vendors.

*Id.* (citation omitted).

 Applying these legal principles to the conclusions reached by the Commission, Kaiser's contention that the proper overall product market is all refractories, both basic and non-basic, can be rejected out of hand. The record is replete with evidence that, due to the risk of chemical contamination, there is virtually no interchangeability of use of basic and non-basic refractories in the steel industry and very little interchangeability in all other industries that consume refractories. In addition, because of the same risks of chemical contamination, there is very little possibility of flexible production of basic and non-basic refractories.

 The Commission based its broad basic refractories market definition on two grounds. First, the Commission focused on the steel industry and found a substantial amount of end-use interchangeability among the various kinds of basic refractories. The Commission noted, however, that certain segments of the basic refractories market were not at all interchangeable in their end-use. Erroneously, the Commission relied solely upon the concept of production flexibility to support an overall basic refractories market. *See* 93 F.T.C. at 833–39.

The Commission divided the basic refractories market into specialties and bricks and subdivided the bricks into submarkets of conventional bricks and BOF bricks. Essentially, therefore, the Commission made three divisions: specialties, conventional bricks, and BOF bricks.

The Commission found interchangeability of use between specialties and bricks. Steelmakers use specialties as mortar between bricks and as protective plaster over worn bricks to delay the time for a complete relining. The Commission quoted the Kaiser refractory handbook, which "describes specialties 'as component products used in connection with—and sometimes—instead of—basic brick'." 93 F.T.C. at 835.

The Commission found no interchangeability of use between BOF bricks and conventional bricks. Conventional bricks are differentiated on their raw material composition and on the kind of bonding used to bind the raw material. These variables affect the durability of the bricks in a furnace. BOF bricks are similar to conventional bricks, except that BOF bricks are either bonded or impregnated with tar. BOF furnaces demand tar-bonded or tar-impregnated bricks, while open-hearth furnaces will tolerate only conventional bricks.

The Commission found great interchangeability of use between tar-bonded BOF bricks and tar-impregnated BOF bricks.

The Commission also found great interchangeability among conventional bricks. Steelmakers use conventional bricks with a substantial degree of interchangeability to equalize the overall rate of wear inside a furnace which has high-wear and low-wear areas. The practice, known as zoning, demands bricks of varying durability. Zoning is not a scientific process but is an art depending on the judgment of expert zoners who arrive at a proper mixture for each particular use in each particular furnace. *See* 93 F.T.C. at 835.

No finding on interchangeability of use between specialties and BOF bricks and specialties and conventional bricks appears in the record. Rather, the findings all relate to basic specialties and basic bricks in general. The record, however, indicates that BOF bricks demand BOF specialties and conventional bricks demand conventional specialties. (Testimony of Keith K. Kappmeyer, Manager of Processed Metallurgy, United States Steel). Moreover, no findings were made on the production flexibility of specialties suitable for use with conventional or with BOF bricks.

The Commission relied on the concept of production flexibility to link BOF bricks and conventional bricks in one overall market and to buttress the linkage of interchangeability between specialties and bricks to include specialties in the same overall market. In defining an overall market of

basic refractories, the Commission conceptualized a continuum of performance characteristics interchangeable in the middle but not at the ends and bound together by production flexibility. 93 F.T.C. at 839.

The Commission found great production flexibility in changing bonding procedures for conventional bricks. The Commission found the potential for flexibility in producing conventional and BOF bricks, with the major difference being the use of tar-bonding or tar-impregnation, in later stages of production, to produce BOF bricks instead of conventional ones. However, it made no specific findings on the amount of conventional-BOF brick production flexibility. The Commission found a significant potential for flexibility in producing basic bricks and basic specialties, as bricks could be formed from a specialties operation by adding, forming, and bonding machinery. The Commission expressly made no finding, however, on the amount of production flexibility in specialties and brick production.

■ Applying the test of *Brown Shoe Co. v. United States* on market definition to the Commission's findings, we disagree that conventional bricks and BOF bricks can be included in the same market. Conventional bricks and BOF bricks do not have reasonable end-use interchangeability or cross-elasticity of demand. These bricks do have cross-elasticity of supply or production flexibility, but we are not persuaded that this court should, on this record, overrule our earlier pronouncements on this matter. *Beatrice Foods Co. v. Federal Trade Comm'n*, 540 F.2d 303, 307 (7th Cir. 1976); *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir. 1977); *Case Student Advertising, Inc. v. National Education Advertising Service, Inc.*, 516 F.2d 1092, 1095 (7th Cir. 1975); *L.G. Balfour Co. v. Federal Trade Comm'n*, 442 F.2d 1, 11 (7th Cir. 1971).

■ Applying the same analysis to the Commission's definition of a market made up of basic specialties, conventional bricks, and BOF bricks, we conclude that the Commission was in error when it formed that definition. Conventional bricks and BOF bricks cannot be in the same market for the reasons noted above. To add basic specialties to the market definition only compounds the error. Specialties and bricks are not reasonably interchangeable. They serve different purposes. Moreover, there is no finding by the Commission that basic specialties can be used interchangeably with conventional bricks and BOF bricks. Indeed some evidence suggests that conventional bricks demand specialties that are different from the specialties demanded by BOF bricks.

■ The Commission's definition of a submarket composed of all basic specialties is not supported by substantial evidence. The evidence of interchangeability of use of basic specialties is meager, and what evidence there is seems to indicate that conventional bricks and BOF bricks may demand their own specialties. More evidence of these characteristics of the market for basic specialties should be required on rehearing.

■ The Commission's definitions of submarkets for conventional bricks and for BOF bricks are supported by substantial evidence and withstand analysis of end-use flexibility together with production flexibility.

## II. *Effects on Competition*

The remaining issue—whether the Commission applied correct legal standards in determining that the acquisition might substantially lessen competition in relevant markets—requires us to resolve conflicting interpretations by the parties of *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

The Commission applies a narrow and restrictive reading to that case, confining it almost to its facts. "In essence," the Commission says:

"the *General Dynamics* decision stands for the common sense proposition that an increase in concentration will not persist no matter how impressive the market shares of the merging firms at the time of acquisition if, at the time of the acqui-

sition, the key competitive assets of either merging party were so depleted that they could not be revived by either the acquired or the acquiring firm."

93 F.T.C. at 847.

Applying that interpretation in this case, the Commission went on to fashion a three-part test for considering whether the evidence of the economic factors that brought about the merger would overcome the statistical evidence of increases in market share and concentration. The Commission concluded:

> [A] respondent [Kaiser] must show:
>
> (a) that one merging firm's market share (in this case, Lavino's) could not be imparted to the other merging firm, so that any increase in concentration will not likely persist over time, (b) that the merging firms had no control over the circumstances that weakened the position of the merging firm whose market shares will be discounted and (c) that neither firm could remedy the position of the weakened firm.

93 F.T.C. at 848.

Kaiser, on the other hand, applies a broad interpretation to *General Dynamics* and argues for an expansion of the failing company defense into a weak company defense. It is Kaiser's contention that the Commission's three-part test is in conflict with the holding of *General Dynamics* and with sound economics. Kaiser argues that by narrowly construing *General Dynamics*, the Commission failed to weigh the evidence of economic factors which tends to rebut the prima facie case of anticompetitive effect shown by increase in market share and concentration and, moreover, placed the unwarranted burden of an affirmative defense on Kaiser.

*A background to General Dynamics*

A review of the decisions before and after General Dynamics is helpful to put the problem of this case in proper context. The wave of post-World War II mergers touched off an alarm about a rising tide of economic concentration. This alarm produced the 1950 amendment to Clayton Act § 7 which is the version of § 7 that exists today. The 1950 amendment changed the 1914 act by prohibiting acquisition of assets as well as stock and by prohibiting mergers the effect of which "may be substantially to lessen competition," rather than prohibiting those mergers that simply resulted in a substantial lessening of competition between the acquired and the acquiring firm. *See generally* L. Sullivan, *Antitrust* §§ 193–99 (1977);[6] Bok, *Section 7 of the Clayton Act and the Merging of Law and Economics*, 74 Harv. L. Rev. 226, 228–33 (1960).

The Supreme Court's first interpretation of amended § 7 came in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The Court there stated:

> Subsequent to the adoption of the 1950 amendments, both the Federal Trade Commission and the courts have, in the light of Congress' expressed intent, recognized the relevance and importance of economic data that places any given merger under consideration within an industry framework almost inevitably unique in every case. Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger.

**6.** Congress was concerned in a very broad and general way about increases in business concentration. It was less a matter of having well formed theories about the changing structure of American industry than a shared and general feeling of concern, even alarm, about the economic, social and political effects of the changes going on . . . . Congress wanted the courts to be tougher than they had been since 1911 and not wait for a showing of power aggressively used, or even for a showing that structural change would inevitably do injury to the competitive process. It wanted the courts to act at the edge of harm in order to choke off those mergers likely alone or as part of a merger movement to cause irreversible injury to the competitive process.

L. Sullivan, Antitrust § 199, at 592–93 (1977).

*Id.* at 322 n.38, 82 S.Ct. at 1522 n.38 (citations omitted). The Court identified the following factors as relevant to a decision on whether a merger violated § 7: the degree of existing concentration in the market; trends toward increasing concentration; foreclosure of suppliers and buyers within the market; and the ease or difficulty of new entry into the market. *Id.* at 322, 82 S.Ct. at 1522, *see* Note, *Horizontal Mergers After United States v. General Dynamics Corp.*, 92 Harv. L. Rev. 491, 495 (1978). Finally, the Court recognized a fundamental purpose of § 7 to be the "provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." *Brown Shoe v. United States*, 370 U.S. at 317, 82 S.Ct. at 1520.

*Brown Shoe* indicated that judges should make a broad-ranging inquiry into the likelihood that competition would be adversely affected by a merger. In its next major § 7 case, however, *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), the Court retreated from that approach. It instead relied on statistical evidence of concentration in the relevant market that resulted from the merger. The Court termed the economic data relevant to a broad-ranging inquiry "both complex and elusive," and noted that "unless businessmen can assess the legal consequences of a merger with some confidence, sound business planning is retarded.... So also, we must be alert to the danger of subverting congressional intent by permitting a too-broad economic investigation." *Id.* at 362, 83 S.Ct. at 1741. Citing economic literature as a justification for this approach, the Court indicated that it was adopting a policy designed to prevent the development of oligopolistic markets and their consequent anticompetitive effects. *Id.* at 363 n.38, 83 S.Ct. at 1741 n.38. The Court thus laid down its general test:

> [A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently

likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*Id.* at 363, 83 S.Ct. at 1741. The Court then held that the merger at bar, which resulted in the defendant controlling at least 30% of the commercial banking market and which resulted in increasing the two largest firms concentration by one-third, from 44% to 59%, violated § 7. *Id.* at 364–65, 83 S.Ct. at 1742. In so doing, the Court noted that such a statistical increase exceeded the level of concentration, identified by current economic thinking as likely to produce oligopolistic pricing. Finally, the Court held that the arguments of the defendant did not rebut the presumption of illegality raised by the government's concentration statistics. These arguments were: bank officials testified that commercial banking competition was vigorous and would remain so after the merger; that 40 other banks remained in the Philadelphia area; that banking was a heavily regulated business; that through merger banks could follow their customers to the suburbs and retain their business; that increased capital would result in increased lending limits and allow the defendant to compete with New York banks for very large loans; and that a new large bank would stimulate the economic development of Philadelphia. *Id.* at 366–71, 83 S.Ct. at 1743–45.

The Court's next major decision came in *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966). The merger in *Von's* produced a firm that controlled only 7.5% of the Los Angeles area retail grocery market. *Von's* is widely cited as holding, in effect, that horizontal mergers were "presumptively, if not per se, unlawful" under § 7. Note, *Horizontal Mergers After United States v. General Dynamics*, 92 Harv. L. Rev. 491, 498 (1978). The decision produced Justice Stewart's famed dissent, which protested, "The sole consistency that I can find is that in litiga-

tion under § 7, the Government always wins." 384 U.S. at 301, 86 S.Ct. at 1495.[7]

### The decision in General Dynamics

Although much of *United States v. General Dynamics Corp.'s* potential influence remains to be discovered, judges, lawyers, and commentators widely regard the case as ushering in a new era of Clayton Act § 7 merger analysis. *See, e. g.,* Robinson, *Recent Antitrust Developments: 1974,* 75 Colum. L. Rev. 243, 243–44 (1975).

*General Dynamics* concerned the acquisition of a coal company by a corporation with coal holdings. In 1959 Material Service Corp., a large midwestern producer of building materials and deep-mined coal, acquired effective control of United Electric Coal Companies. United Electric operated strip and open-pit coal mines in Illinois and Kentucky and sold the bulk of its output to electric utilities. General Dynamics, a large corporation concentrating on defense sales to government, then acquired Material Service as part of a diversification program. In 1966 General Dynamics acquired all the stock of United Electric.

The Department of Justice sued to divest United Electric from General Dynamics, alleging that the 1959 effective takeover of United Electric by Material Service violated Clayton Act § 7. It sought to define the product market as coal and the geographic market as either the State of Illinois or the industry-recognized Eastern Interior Coal Province Sales Area.

The district court held squarely against the government on several grounds. The district court defined the product market as a broader energy market, which included oil, natural gas, and nuclear and geothermal power. It defined the geographic market

as consisting of 10 smaller areas, based on freight rates charged to major coal consumers. Finally, it held that the 1959 acquisition did not substantially lessen competition in any product or geographic market, either those markets advanced by the government or those adopted by the court.

The district court based its findings of no lessening of competition on four grounds. First, it found that producer concentration in the coal industry was an inevitable structural change resulting from declining demand for coal. Second, the court noted that Material Service conducted deep-mining, while United Electric conducted strip mining. Third, it found that the two companies were direct competitors for only one customer, Commonwealth Edison. Finally, the court found that in the crucial area of uncommitted proven coal reserves, as opposed to committed coal production, United Electric was so weak that the government's concentration statistics on coal production did not accurately reflect United Electric's ability to compete.

The Supreme Court affirmed, finding no violation of § 7. In so doing, it reached only the ground that the statistics on concentration resulting from the merger did not accurately forecast competitive conditions in the coal market. The Court reached back to *Brown Shoe*, in which "we cautioned that statistics concerning market share and concentration, while of great significance, were not conclusive indicators of anticompetitive effects." *General Dynamics*, 415 U.S. at 498, 94 S.Ct. at 1194.

The weakness of the government's statistics lay in what they measured—past production, or annual sales of coal coming out of the mines and into the possession of purchasers. The district court found, how-

---

**7.** The government's victories, in addition to *Brown Shoe, Philadelphia Bank* and *Von's,* were *United States v. Continental Can Co.,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *United States v. Aluminum Co. of America* (Rome Cable), 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); *United States v. Penn-Olin Chemical Co.,* 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *Federal Trade Comm'n v.*

*Consolidated Foods Corp.,* 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); and *United States v. Pabst Brewing Co.,* 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966). They also include, after *Von's, Federal Trade Comm'n v. Procter & Gamble* (Clorox), 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); and *Ford Motor Co. v. United States,* 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972). *See* L. Sullivan, Antitrust § 202 at 600 nn. 1–5 (1977).

ever, that electric utilities purchased most of the nation's coal and that those purchases were, in the great majority of cases, pursuant to long-term requirements contracts. This caused the Supreme Court to uphold the district court's rejection of the statistics relied upon by the government and to observe:

> Evidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete. In most situations, of course, the unstated assumption is that a company that has maintained a certain share of a market in the recent past will be in a position to do so in the immediate future. Thus, companies that have controlled sufficiently large shares of a concentrated market are barred from merger by § 7, not because of their past acts, but because their past performances imply an ability to continue to dominate with at least equal vigor . . . .

*General Dynamics*, 415 U.S. at 501, 94 S.Ct. at 1195. The district court had found United Electric's coal reserve prospects "unpromising", and the Supreme Court went on to add: "[I]rrespective of the company's size when viewed as a producer, its weakness as a competitor was properly analyzed by the District Court and fully substantiated that court's conclusion that its acquisition by Material Service would not 'substantially . . . lessen competition . . . .'" *Id.* at 503–04, 94 S.Ct. at 1196–97.

The government had argued that the district court's reliance on United Electric's depleted and committed resources upheld what essentially was a failing company defense which must meet the strict limits placed on that defense by previous Court decisions. Those limits were that the acquired firm prove it faced the grave probability of a business failure and that it tried and failed to merge with some other company. The parties conceded that the facts did not fit the strict requirements of the failing company defense. In the face of the government's argument, the Court distinguished General Dynamic's defense from the failing company defense and held that the failing company defense was inapposite

under the circumstances of *General Dynamics*:

> The appellees' demonstration of United's weak reserves position, however, proved an entirely different point. Rather than showing United would have gone out of business but for the merger with Material Service, the finding of inadequate reserves went to the heart of the Government's statistical prima facie case based on production figures and substantiated the District Court's conclusion that United Electric, even if it remained in the market, did not have sufficient reserves to compete effectively for long-term contracts. The failing-company defense is simply inapposite to this finding and the failure of the appellees to meet the prerequisites of that doctrine did not detract from the validity of the court's analysis.

*Id.* at 508, 94 S.Ct. at 1199.

The Supreme Court has not explained or amplified its holding in *General Dynamics* to any significant degree. In *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974) and in *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975), the Court interpreted *General Dynamics* to mean that defendants could counter statistical evidence of market concentration by "showing" that concentration ratios "gave an inaccurate account" or "did not accurately depict" the probable effects of the acquisition on competition. 418 U.S. at 631, 94 S.Ct. at 2874; 422 U.S. at 121, 95 S.Ct. at 2119. The questions are: how wide-ranging an examination should a court or commission conduct or permit in such a showing and how much weight should a court or commission give to those factors revealed by such an examination when it decides if the statistics are an inaccurate indicator of future competitive conditions.

It seems significant that the Supreme Court has thus far refused to undertake broad-ranging inquiries. In *General Dynamics* and *Citizens & Southern*, two of the cases in which the court found no § 7 viola-

tion, the evidence refuting the government's statistical proof was clear and strong: in the first a mistaken measurement of the true focus of competition and in the second a convincing finding that the relevant market never was and never would be competitive, coupled with the fact that government regulation had sheltered the banking industry in the past from antitrust violations. In *Marine Bancorporation*, the Court concluded that the Government had established a prima facie case by introducing evidence of concentration ratios which was not rebutted by the defendant but went on to note that there was no evidence of the presence of competitive behavior in the regulated market for banking services.

Lower courts have read *General Dynamics* in a variety of ways. Some have viewed the decision as little more than a reaffirmation of a traditional statistical approach to merger analysis. *Liggett & Myers, Inc. v. Federal Trade Comm'n*, 567 F.2d 1273, 1275 (4th Cir. 1977); *United States v. Blue Bell, Inc.*, 395 F.Supp. 538, 547–48 (M.D.Tenn. 1975). Others take *General Dynamics* a step further and say that, while statistics are the primary index of probable effect on competition, *General Dynamics* holds that such statistics are not conclusive. *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 449 F.Supp. 951, 964 (S.D.N.Y.1978); *Federal Trade Comm'n v. Lancaster Colony Corp., Inc.*, 434 F.Supp. 1088, 1094 (S.D.N.Y.1977). Still other courts view *General Dynamics* as requiring a careful factual inquiry into the particular market in question, in order to determine the probable effect on competition, but those courts offer no opinion on how extensive a factual analysis is required. Such courts often cite *Brown Shoe's* admonition to examine the structure, history, and probable future of a particular market in order to determine the anticompetitive effects of a merger. *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 851 n.20 (6th Cir. 1979); *Fruehauf Corp. v. Federal Trade Comm'n*, 603 F.2d 345, 352 (2d Cir. 1978); *West Texas Utilities Co. v. Texas Electric Service*, 470 F.Supp. 798, 819 (N.D.Tex. 1979); *United States v. Tracinda Investment Corp.*, 447 F.Supp. 1093, 1106 (C.D. Cal.1979); *United States v. M.P.M., Inc.*, 397 F.Supp. 78, 91 (D.Colo.1975).

Finally, some courts have articulated specific factors they have weighed while undertaking a *General Dynamics* analysis. One such case is *United States v. International Harvester Co.*, 564 F.2d 769 (7th Cir. 1977). There, this court considered: (1) the financial weakness of the acquired company; (2) the *de facto* independence of the acquired company from the acquiring company; (3) the strong level of competition in the relevant market; (4) the tendency of the market toward even stronger levels of competition; and (5) market entry barriers. In *Federal Trade Comm'n v. National Tea Co.*, 603 F.2d 694, 701 (8th Cir. 1979), the court considered: (1) the weakness of the acquiring firm as a competitor; (2) the status of the relevant market as "relatively competitive"; and (3) the likelihood that the acquiring firm would fail without the merger.

In *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1203 (2d Cir. 1978), the Second Circuit considered, in addition to market shares, "reliable data" on the ease of entry into the market and on the trends toward or away from concentration.

In *United States v. Black & Decker Manufacturing Co.*, 430 F.Supp. 729, 755 (D.Md. 1976), the district court found that, given the lack of any trend toward deconcentration, the high level of concentrations that characterized the market, the relatively significant entry barriers, and the lack of clear price competitiveness, there was no showing that the government's statistics inaccurately depicted competition in the market.

And in *United States v. Healthco, Inc.*, 387 F.Supp. 258, 273 (S.D.N.Y.1975), the court stated it should take into account undisputed changes in the structure of the market which have already occurred but not speculative changes that might take place in the future.

*General Dynamics as support for a weak company defense*

Justice Stewart, writing for the majority in *General Dynamics*, did more than point

out that the government's statistics on market share were irrelevant because they measured the wrong index of market power. He also stated that the acquired company's weakness as a competitor was correctly analyzed by the district court and showed that the acquisition would not substantially lessen competition. 415 U.S. at 503–04, 94 S.Ct. at 1196–07.

The respondent, Kaiser, has focused on this aspect of *General Dynamics* and argues that acquisition of a financially troubled company does not violate § 7. The essence of the argument is that *General Dynamics* has created a weak company defense to § 7 actions as a logical extension of the court-recognized failing company defense. Kaiser reasons that lack of financial resources adversely affected Lavino's ability to compete and that the acquisition therefore will not harm competition.

The principal authority for the existence of a weak company defense is this court's decision in *United States v. International Harvester Co.*, 564 F.2d 769 (7th Cir. 1977). International Harvester, a multinational manufacturer of heavy equipment, was the second-largest producer in the United States of farm machinery and tractors. International Harvester's 1973 sales of high-powered farm tractors, the relevant market, totalled $88 million. Steiger Tractor, Inc. specialized in the manufacture and sale of four-wheel-drive farm tractors. Steiger's 1974 tractor sales totalled $35.5 million. Steiger manufactured tractors not only under its own name but also for International Harvester, Allis-Chalmers Corp., and Canadian Co-Operative Implements, Inc.

Steiger had a history of serious financial problems. In 1970 some suppliers refused to ship it parts, and it lost a half million dollars. Steiger negotiated new contracts and also new financing secured by accounts receivable. Its losses, however, continued to mount. Steiger exhausted its credit with banks and obtained factor financing at double the prime lending rate. Steiger's financial condition began to improve slightly, but it still labored under serious restrictions.

In 1974 International Harvester acquired 39% of Steiger's common stock. The agreement gave International Harvester the right to name three of Steiger's nine corporate directors. Steiger received $5 million for the stock, as well as a five-year contract to produce large numbers of tractors for International Harvester.

The government contended that the stock acquisition violated Clayton Act § 7. The district court held that it did not, and we affirmed for the following reasons:

1. The financial weakness of Steiger made it a weak competitor, so that statistics measuring resulting market concentration did not accurately portray the effect of the acquisition on competition. 564 F.2d at 773–74. *See also id.* at 773 n.7.

2. International Harvester had not controlled or attempted to control Steiger's business activities following the stock purchase. The three International Harvester directors used their position only to obtain standard financial data from Steiger and nonsensitive data from other sources. "Harvester has not interfered with Steiger's manufacturing or sales efforts in the past, and the court found that there is no likelihood that Harvester will do so." *Id.* at 777.

3. The stock purchase allowed Steiger to solve its financial problems, brought it a larger increase in sales, and turned it into a viable competitor in the high-powered tractor market. *Id.* at 778.

4. Competition between Steiger and International Harvester " 'remains intense' . . . with both companies actively vying for the same customers and with 'active price competition' between defendants." *Id.*

5. The district court found that, since 1973, "competitive activity in the four-wheel-drive tractor industry has increased markedly, with that industry 'going to be even more fiercely competitive than it has been.' " *Id.* The market was tending away from concentration, "with two other firms already entering the industry and five more planning to do so." *Id.*

It should be emphasized that *International Harvester* does not rely solely on the acquired firm's weak financial condition as a defense to § 7.[8] The case instead considers the firm's weak condition as one relevant economic factor among many. It is therefore a mischaracterization to view *International Harvester* as adopting a weakened company doctrine as a per se defense to § 7 liability. Sound economic theory supports any of the other four grounds as reasons to avoid § 7 liability. Financial weakness, while perhaps relevant in some cases, is probably the weakest ground of all for justifying a merger. The acquisition of a financially weak company in effect hands over its customers to the financially strong, thereby deterring competition by preventing others from acquiring those customers, making entry into the market more difficult. Moreover, a weak company defense would extend the failing company doctrine, a defense which the Supreme Court in *General Dynamics* observed has strict limits. 415 U.S. at 506, 94 S.Ct. at 1198.[9]

The court in *United States v. Tracinda Investment Corp.*, 477 F.Supp. 1093, 1110 (C.D.Cal.1979), correctly viewed *International Harvester* as not standing for the proposition that a weak company defense is a per se defense to a § 7 proceeding. There, the district court cited *International Harvester* when holding that, where the acquired firm was financially weak, where the industry was vigorously competitive, and where the industry was trending away from concentration, the acquisition did not violate § 7.

Unfortunately, other courts have characterized *International Harvester* as a weak company case and followed it primarily on that ground. Kaiser argues for precisely that characterization in the case at bar. In *Federal Trade Comm'n v. National Tea Co.*, 603 F.2d 694 (8th Cir. 1979), the defendant grocery chain acquired a Minneapolis grocery chain. The court held the acquisition did not violate § 7. The Eighth Circuit relied heavily on the district court's finding that, but for the merger, National was so weak it would have left the Minneapolis market. *Id.* at 700. In *United States v. Consolidated Foods Corp.*, 455 F.Supp. 108 (E.D.Pa.1978), the court read *General Dynamics* and *International Harvester* to mean that the acquisition of a financially weak competitor did not harm competition and thus did not violate § 7. *See also F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 818 (2d Cir. 1979) (dicta).

*The Commission's Application of General Dynamics*

As we noted at the beginning of this discussion, the Commission has made a restrictive, and we believe erroneous, interpretation of *General Dynamics*. While much of the Commission's discussion demonstrates a proper grasp of the decision,[10] instead of interpreting *General Dynamics* as a case of statistical measurement of the wrong economic factors, an interpretation it has made on numerous occasions,[11] the

---

**8.** In *International Harvester*, the court noted that the government's prima facie case based on statistical proof was rebutted by "persuasive evidence, *including* Steiger's weakened financial condition." The court did not say that the evidence of Steiger's weakened financial condition by itself sufficed to rebut the government's prima facie case.

**9.** For further criticism of the failing company defense, *see* Bok, *Section 7 of the Clayton Act and the Merging of Law and Economics*, 74 Harv.L.Rev. 226, 340 (1960); Note, *The Failing Company Doctrine since General Dynamics: More than Excess Baggage*, 47 Fordham L.Rev. 872, 886–87 (1979); Note, *All the King's Horses and All the King's Men; The Failing Company*

*Doctrine as a Conditional Defense to Section 7 of the Clayton Act*, 4 Hofstra L.Rev. 643, 671 (1976).

**10.** 93 F.T.C. at 847–48.

**11.** *In the Matter of Pillsbury Co.*, 93 F.T.C. 966, 1033–36 (1979); *In the Matter of Reichhold Chemicals, Inc.*, 91 F.T.C. 246, 289–90 (1978); *In the Matter of Jim Walter Corp.*, 90 F.T.C. 671, 720, 753–55 (1977); *In the Matter of American General Insurance Co.*, 89 F.T.C. 557, 603–04, 621 (1977); *In the Matter of Liggett & Myers Inc.*, 87 F.T.C. 1074, 1165, 1171–72 (1976).

Commission derives conclusions from *General Dynamics* that cannot be supported.

■■■■■ The Commission is mistaken on several grounds:

(1) Characterization of the defense in *General Dynamics* as an "affirmative defense" is wrong. *General Dynamics* does not require the defendant to present a defense upon which he bears the burden of proof in the sense of ultimately persuading the trier of fact that he is entitled to relief. *General Dynamics* requires the defendant to come forward with evidence to rebut the government's prima facie case of substantial lessening of competition through statistics showing increase in market share and concentration in relevant product markets. The government continues to bear the burden of persuasion even after it has made out a prima facie case through statistical evidence; [12]

(2) The Commission also erroneously relied on *General Dynamics* as holding that the respondent must show that "one merging firm's market share (in this case Lavino's) could not be imparted to the other merging firm, so that any increase in concentration will not persist over time." 95 F.T.C. at 848. One firm in *General Dynamics* did not impart to the other a large market share. Rather, a negligible market share was imparted when the true measure of competition was examined;

(3) The Commission was again incorrect in ruling that Kaiser must show that the "merging firms had no control over the circumstances that weakened the position of the merging firm whose market shares will be discounted." 93 F.T.C. at 848. It is hard to see how control over forces of weakness has any relevance. If an acquired firm could have controlled the forces that made it weak, it would never have become weak. Moreover, as Kaiser argues under *General Dynamics*, "it is the company's future prospects at the time of the acquisition that count, not the circumstances that led to its then present state."[13]

(4) Finally, the Commission mistakenly required that Kaiser show that neither firm could remedy the position of the weakened firm. 93 F.T.C. at 848. If neither firm could remedy the position of the weak, acquired firm, then no firm would be interested in acquisition, and no situation could ever arise that would meet the Commission's test.

■■■■ The Supreme Court, however, has indicated clearly that *General Dynamics* is to have application to future cases. The error in the Commission's approach to *General Dynamics* lies in the Commission's attempt to derive principles from the government's erroneous statistical measurement of market concentration in the coal industry, rather than rejecting that discredited analysis and accepting the rule that persuasive economic evidence can rebut a prima facie case bottomed on statistics of market share and concentration.

---

**12.** *But see United States v. Citizens & Southern National Bank,* 442 U.S. 86, 120, 95 S.Ct. 2099, 2118, 45 L.Ed.2d 41 (1975) and *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 631, 94 S.Ct. 2856, 2874, 41 L.Ed.2d 978 (1974), stating that upon the government's establishment of a prima facie case under *General Dynamics* the burden then shifts to the acquiring firm to show that the statistics do not accurately depict competitive conditions. We do not view this as indicating that the burden of persuasion shifts from the government but only

that a burden of going forward with the evidence shifts. A parallel situation is found in the shifting of the burden of introducing evidence in discrimination cases. *See Board of Trustees v. Sweeney,* 439 U.S. 24, 25 n.2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978); *id.* at 27, 99 S.Ct. at 296 (Stevens, J. dissenting).

**13.** This is not to say that predatory or collusive conduct on the part of the merging firms might not be relevant in a future case.

*Disposition*

■ In conclusion, and by way of summary, we observe that under *General Dynamics* market concentration statistics continue to be the primary index for measuring market power, and, if they are unrebutted, those statistics standing alone can support a finding of a § 7 violation. The market concentration statistics, however, must be relevant to the focus of competition. The statistics must be an accurate measure of future ability to compete in a relevant market. Nonstatistical evidence which casts doubt on the persuasive quality of the statistics to predict future anticompetitive consequences may be offered to rebut the prima facie case made out by the statistics. The nonstatistical evidence of relevant economic factors must be weighed by the trier of fact in arriving at a conclusion as to whether the effect of an acquisition may be substantially to lessen competition. Among the factors to be considered might be ease of entry into the market, the trend of the market either toward or away from concentration, and the continuation of active price competition. In some cases unique economic circumstances might make other factors significant, e. g., the genuine independence of the acquired company as in *United States v. International Harvester Co.*, 564 F.2d 769 (7th Cir. 1977) or the merger of two small firms to survive competitively in a market, or the demand of a market for large producers. Finally, the financial weakness of the acquired firm, while it may be a relevant factor in some cases, certainly cannot be the primary justification of a merger in resistance to a § 7 proceeding. History records and common sense indicates that the creation of monopoly and the loss of competition involve the acquisition of the small and the weak by the big and the strong.

■ While the record in this case might support the conclusion that, upon a proper definition of relevant markets and application of correct principles of law, the effect of the acquisition of Lavino by Kaiser may be substantially to lessen competition, that is not for us to determine but is a matter for the expertise of the Commission. Our only concern is that the Commission consider appropriate evidence and apply proper principles. *See Boc International, Ltd. v. Federal Trade Comm'n*, 557 F.2d 24, 28 (2d Cir. 1977); *Sawyer Transport, Inc. v. United States*, 565 F.2d 474, 478–79 (7th Cir. 1977).

For the reasons advanced in the opinion the order of the Federal Trade Commission dated May 17, 1979 is vacated and set aside, and the cause is remanded to the Commission for further proceedings consistent with this opinion.