**FEDERAL TRADE COMMISSION,**
Plaintiff–Appellant,

v.

**UNIVERSITY HEALTH, INC.,** University Health Services, Inc., University Health Resources, Inc., Defendants–Appellees,

Health Care Corporation of Sisters of St. Joseph of Carondelet, St. Joseph Center for Life, Inc., St. Joseph Hospital, Augusta, Georgia, Inc., Defendants–Intervenors, Appellees.

No. 91–8308.

United States Court of Appeals,
Eleventh Circuit.

Order May 6, 1991.

Decided July 26, 1991.

David C. Shonka, E.T.C., Washington, D.C., for plaintiff-appellant.

Kevin E. Grady, Atlanta, Ga., for Humana Hosp.

Wyck A. Knox, Jr., Gregg E. McDougal, Knox & Zacks, Patrick J. Rice, Hull, Towill, Norman & Barrett, Augusta, Ga., Robert W. McCann, Epstein, Becker & Green, P.C., Washington, D.C., Gary J. Toman, Knox & Zacks, Atlanta, Ga., for defendants-appellees.

Before TJOFLAT, Chief Judge,
BIRCH, Circuit Judge, and HILL, Senior
Circuit Judge.

## BY THE COURT:

The district court's order denying the Federal Trade Commission injunctive relief is reversed. The district court shall grant the requested injunction instanter. An opinion will follow.

IT IS SO ORDERED.

Appeals from the United States District Court for the Southern District of Georgia.

Before TJOFLAT, Chief Judge,
BIRCH, Circuit Judge, and HILL, Senior
Circuit Judge.

TJOFLAT, Chief Judge:

The Federal Trade Commission (FTC) filed this action to obtain a preliminary injunction pursuant to section 13(b) of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 53(b) (1988),[1] to prevent the appellees from consummating an asset acquisition, which the FTC plans to challenge as violative of section 7 of the Clayton Act, 15 U.S.C. § 18 (1988).[2] Following a hearing, the district court held that the FTC had failed to demonstrate a likelihood of ultimate success in proving that the intended acquisition would substantially lessen competition; accordingly, the court denied the FTC's request for a preliminary injunction. In this appeal, we must answer two questions, both of which relate to whether it is likely that the FTC ultimately will prevail in its section 7 challenge. First, we must decide whether section 7 applies to asset acquisitions by nonprofit hospitals. We hold that it does. Second, we must determine whether the district court, in evaluating the FTC's section 7 challenge, correctly applied the law. We conclude that it did not. Therefore, we reverse the district court's judgment and grant the FTC its requested preliminary injunction.

---

1. Section 13(b) of the FTCA provides, in pertinent part:

 Whenever the [FTC] has reason to believe—
 (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the [FTC], and
 (2) that the enjoining thereof pending the issuance of a complaint by the [FTC] and until such complaint is dismissed by the [FTC] or set aside by the court on review, or until the order of the [FTC] made thereon has become final, would be in the interest of the public—
 the [FTC] ... may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the [FTC]'s likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond....

2. Section 7 of the Clayton Act provides, in pertinent part:

 No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the [FTC] shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

## I.

This case involves a proposed acquisition by appellees University Health, Inc. (UHI), University Health Services, Inc. (UHS), and University Health Resources, Inc. (UHR) (collectively, University).[3] UHS operates University Hospital, a nonprofit facility that it leases from the Richmond County (Georgia) Hospital Authority. University plans to acquire the assets of St. Joseph Hospital, Augusta, Georgia, Inc. (St. Joseph), a nonprofit entity owned by the Health Care Corporation of Sisters of St. Joseph of Carondelet (HCC), a Missouri nonprofit corporation run by the Roman Catholic church.[4]

Under the proposed transaction, University would acquire most of the assets and interests of St. Joseph from HCC.[5] In return, HCC would receive University's fifty-percent interest in Walton Rehabilitation Hospital[6] and a cash settlement (based on the value of certain assets at closing).[7] The total transaction is worth over $38 million. A ten-year covenant not to compete, applicable to operations in the Augusta area, would require HCC to stay out of the general acute-care hospital market and University to stay out of the rehabilitation hospital market.

The appellees filed a premerger notification with the Department of Justice and the FTC as required by section 7A of the Clayton Act, 15 U.S.C. § 18a (1988). The statutory waiting period, after which the appellees could consummate their proposed acquisition, was to expire on March 20, 1991. To forestall the acquisition, pending the outcome of the FTC's adjudicative proceedings, the FTC brought the instant action for preliminary injunctive relief on March 20.[8] The FTC is concerned because University's acquisition of St. Joseph's assets would eliminate a patient-oriented, general acute-care hospital from the market that serves Richmond and Columbia Counties in Georgia and Aiken County in South Carolina (the Augusta area). This, according to the FTC, would so concentrate the market that consumers likely would suffer at the hands of the four remaining hospitals in the market, in which University Hospital would be the dominant participant. Without a preliminary injunction, the appellees will consummate the transaction, hindering the FTC's ability to enforce effectively section 7 of the Clayton Act.

Following expedited discovery, the district court held a hearing on April 3 and 4 to decide whether to issue the preliminary injunction requested by the FTC.[9] The parties did not seriously dispute the material facts.[10] The court found the relevant mar-

---

3. UHI is a nonprofit Georgia corporation based in Augusta, Georgia. UHI is the parent company of UHS and UHR: UHS operates University Hospital; UHR is a for-profit corporation owned by UHS.

4. HCC owns St. Joseph through a holding company, St. Joseph Center for Life, Inc. (Center for Life). HCC, St. Joseph, and Center for Life are all appellees.

5. In addition, UHI would acquire 50% interests in a retirement community and a social services agency from St. Joseph and the Center for Life (UHS already owns the other half-interests). St. Joseph Ventures, Inc., a for-profit subsidiary of Center for Life, would also transfer to UHR its 5% interest in a medical office building under construction on the St. Joseph campus, various medical office leases, and contracts to provide pharmaceuticals valued at less than $10,000.

6. Center for Life owns the other 50%.

7. HCC and Center for Life would retain the home care and hospice operations of St. Joseph.

8. The FTC also moved for a temporary restraining order, to prevent University from acquiring St. Joseph's assets before the district court could decide whether to issue the preliminary injunction. The court did not issue the temporary restraining order, however, because the appellees agreed not to consummate the transaction until after the court ruled on the FTC's motion for an injunction.

9. Prior to this hearing, the appellees moved to dismiss this action on the ground that the FTC lacked jurisdiction to challenge asset acquisitions by nonprofit hospitals, like University Hospital, under section 7 of the Clayton Act. The court denied the motion. For a discussion of this issue, see *infra* part II.

10. The district court, on April 4, entered, from the bench, findings of fact and conclusions of law, denying the FTC's request for a preliminary injunction. The facts presented in our opinion are based on this oral order, as well as the court's supplemental written order, entered on April 11, 1991, in which the court summarized

ket to be the provision of in-patient services by acute-care hospitals in the Augusta area.[11] Presently, five hospitals compete in this market: University Hospital; St. Joseph; Humana Hospital, a for-profit facility in Augusta; Hospital Corporation of America, a for-profit hospital in Aiken; and the Medical College of Georgia, a state teaching hospital.

Following the proposed transaction, the court found, the relevant market would be extremely concentrated, with University Hospital controlling approximately forty-three percent of it.[12] Furthermore, the court found that Georgia's certificate of need law, which restricts the ability of existing hospitals to expand their output and the ability of outsiders to build new hospitals, is a "substantial" barrier to entry into the relevant market. Thus, the market's concentration could not easily be dissipated by the entry of new competitors.

Despite these facts, the court concluded that it was not likely that the proposed acquisition would substantially lessen competition. First, the court noted that University Hospital and St. Joseph are non-profit corporations. Because of this, the court assumed that they would not act anticompetitively; indeed, the court stated that "[t]he Board of University Hospital is quite simply above collusion." Second, although the court concluded that St. Joseph was not a "failing company," *see infra* note 28, it found that St. Joseph was a weak competitor in the relevant market. This, according to the court, showed that the acquisition would not substantially lessen competition—St. Joseph was not, in the court's view, a true competitor of University Hospital. Finally, the court noted that a "number of efficiencies ... would result from the [proposed] acquisition." Most importantly, the acquisition would eliminate duplicate expenses for capital outlays (like buildings or equipment) and administration. Moreover, the proposed acquisition would, in the court's words, eliminate "wasteful competition," that is, competition between St. Joseph and University Hospital in services for which demand is low. Thus, after considering all of these factors, the court

the reasons for its April 4 ruling. When necessary, however, we augment the district court's findings with uncontested facts that the parties established at the hearing.

11. The court noted, in both its initial oral order and its supplemental written order, that University Hospital and St. Joseph do not compete in every acute-care service. Rather, there are approximately 19 major diagnostic categories in which these hospitals compete. It does not appear that the district court intended to limit its market definition solely to these 19 categories. Furthermore, as the FTC points out in its brief to us, such a redefinition of the relevant product market would be of no moment for our purposes; it would only strengthen the FTC's case by, in effect, overvaluing St. Joseph's strength. For ease of discussion, we will treat the provision of acute-care services in general as the relevant product market.

12. The most prominent method of measuring market concentration is the Herfindahl–Hirschmann Index (HHI). The Justice Department and the FTC rely on the HHI in evaluating proposed horizontal mergers (such as the asset acquisition in this case). *See* U.S. Dep't of Justice, Merger Guidelines §§ 3.1, 3.11(c), 4 Trade Reg.Rep. (CCH) ¶ 13,103, at 20,560–61 (1988) [hereinafter Merger Guidelines]. The HHI is calculated by summing the squares of the market shares of every firm in the relevant market.

For example, in a market with six firms with market shares of 25%, 20%, 20%, 15%, 10%, and 10%, the HHI is 1850 ($25^2 + 20^2 + 20^2 + 15^2 + 10^2 + 10^2 = 1850$). Under this test, a market in which the premerger HHI is above 1800 is considered "highly concentrated," and a merger in such a market, which increases the HHI by over 50, raises significant antitrust concerns because it presents a substantial opportunity for anticompetitive collusion. Furthermore, any merger that increases a market's HHI by over 100, to a post-merger level over 1000, raises antitrust concerns. In the present case, the proposed merger would increase the HHI by over 630 to approximately 3200.

Another method used to evaluate market concentration is the four-firm concentration ratio (CR4), which sums the market shares of the four largest firms in the relevant market. (Some economists prefer an eight-firm concentration ratio.) The Department of Justice used the CR4 prior to 1982, when it replaced it with the HHI. (The HHI, unlike the CR4 or CR8, reflects a higher market concentration as the disparity in the size of firms increases and as the number of firms outside the largest four or eight decreases.) Generally, a market with a CR4 greater than 75 is conducive to collusion and, hence, mergers in such markets deserve careful scrutiny. In this case, the post-merger CR4 would equal 100 since only four hospitals would exist.

decided that it was not likely that the proposed acquisition would substantially lessen competition.

Moreover, the court determined that the equities weighed in favor of not issuing the injunction. First, the court observed that "the denial [or delay] of the acquisition would operate to force upon the Sisters of a[ ] holy order a mission which [they do not choose to pursue]." Second, the court thought that competition would actually be enhanced by the acquisition, keeping prices low and quality of service high. Third, the court concluded that the injunction would deal "a serious blow to property values and to the public's perception of St. Joseph as a hospital service provider." Finally, the court posited that excess capacity (i.e., the existence of more hospital beds than necessary to service the Augusta area) "has produced diseconomies of scale ... [and] higher prices without reason"; by allowing the transaction to proceed, however, these problems would be solved. The court, therefore, denied the FTC's request for a preliminary injunction.

The FTC now appeals. It argues that the district court misapplied the law in evaluating whether to issue the preliminary injunction. The FTC contends that, by showing that the proposed acquisition would result in an extremely concentrated market, it was entitled to a presumption that the proposed acquisition would yield anticompetitive results. Additionally, the FTC contends, it buttressed its case by showing that a substantial barrier to entry exists in the relevant market.

The district court, according to the FTC, relied on legally insufficient factors to overcome the presumption that the proposed acquisition would substantially lessen competition. First, the court erroneously assumed that University Hospital, as a nonprofit entity, would not act anticompetitively. Second, argues the FTC, it is of no moment whether St. Joseph is a weak competitor; there is only, in limited circumstances, an exception for acquisitions of "failing companies," which St. Joseph is not. Nor, contrary to the district court's

ruling, is there an efficiency defense to section 7 challenges. Thus, concludes the FTC, it has demonstrated a substantial likelihood of ultimate success on the merits.

Moreover, the FTC argues, it has shown that a balancing of the equities favors issuance of the injunction. Failure to issue the injunction would frustrate the FTC's ability to enforce the antitrust laws, which protect the public from anticompetitive behavior. In contrast, only private equities support the district court's decision not to issue the preliminary injunction; only HCC and University Hospital and its competitors stand to gain from this acquisition. Therefore, the court erred in failing to issue the injunction.

In response, the appellees contend that the district court, although erroneously ruling that the FTC had jurisdiction to bring this action, *see supra* note 9 and *infra* part II, correctly applied the law in deciding not to issue the preliminary injunction. First, they argue, the district court properly relied on St. Joseph's bleak financial prospects in determining that the acquisition would not substantially lessen competition. Second, the court correctly found that the proposed acquisition would create significant efficiencies and that this factor supports the legality of the transaction. Third, the court properly concluded that University Hospital's obligations to the Richmond County Hospital Authority and other public entities demonstrate that it would not collude unlawfully with its competitors.

Furthermore, the appellees assert that the public interest would be harmed by the issuance of the requested preliminary injunction. The injunction would prohibit HCC from "salvaging [its] investment and redirecting these resources to unmet community needs, such as rehabilitation, home health care, and hospice. Further, University [Hospital] would be hindered in serving the public needs ... through cost reductions and expansion of its services." The equities, then, weigh in their favor. Accordingly, the court properly decided not to

issue the requested injunction.[13]

■ We hold that the FTC is entitled to a preliminary injunction in this case. We first note that the FTC, as the district court held, has jurisdiction to challenge this acquisition. The court, however, erroneously decided that the FTC did not demonstrate that it likely would prevail in its section 7 challenge. The FTC made a strong showing that the proposed acquisition would substantially lessen competition, and the appellees failed to overcome this showing. The appellees did not introduce sufficient evidence to demonstrate that, because of St. Joseph's bleak prospects for the future, the proposed acquisition would not substantially lessen competition. Nor did the appellees show that the intended acquisition would yield significant economies to offset any anticompetitive costs it produces. Moreover, the district court's assumption

---

13. The appellees make two additional arguments, which we dispose of here. First, they argue that the acquisition in question is immune from antitrust scrutiny under the state-action doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. *See Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). The appellees claim that Georgia's certificate of need law, which regulates the creation of new hospitals and the expansion of existing hospitals based on the health-care needs of local communities, evinces a state policy favoring the displacement of unfettered competition among hospitals for health-care services. According to them, the clearly foreseeable result of this state law is the suppression of all competition in the hospital industry. Furthermore, since the state's policy is exercised by local governmental authorities, here the Richmond County Hospital Authority, which has delegated its power to University, active supervision by the state is not required. *Cf. id.* at 47, 105 S.Ct. at 1720. Alternatively, if active supervision is required, *see California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), the appellees argue that the existence of judicial review is sufficient to establish state supervision. (In support of their alternative argument, the appellees cite our vacated opinion in *Bolt v. Halifax Hosp. Medical Center,* 851 F.2d 1273, 1282 (11th Cir.), *vacated, reh'g granted,* 861 F.2d 1233 (11th Cir. 1988) (en banc), *reinstated, in part,* 874 F.2d 755 (11th Cir.1989) (en banc), *vacated and rev'd,* 891 F.2d 810 (11th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990), despite our clear direction that the state-action discussion in that opinion *"remains vacated and without precedential value," Bolt,* 874 F.2d at 756 (emphasis added).)

In our judgment, this argument is meritless. Georgia has not clearly articulated a policy to displace all competition by hospitals. Georgia's certificate of need statute specifically exempts most acquisitions by existing hospitals, including the acquisition here, from prior regulatory approval. Ga.Code Ann. § 31–6–47 (Supp. 1990). While the appellees conclude that this exemption "can only be the result of a legislative determination that exempt transactions are consistent with the general ... purpose [of the certificate of need statute]," it is at least equally plausible, if not more so, that Georgia intended that the transactions exempt from its regulatory review be subject to antitrust scrutiny. *Cf. National Gerimedical Hosp. & Gerontology Center v. Blue Cross,* 452 U.S. 378, 389, 101 S.Ct. 2415, 2422, 69 L.Ed.2d 89 (1981) ("Even when an industry is regulated substantially, this does not necessarily evidence an intent to repeal the antitrust laws with respect to every action taken within the industry.... Intent to repeal the antitrust laws is much clearer when a regulatory agency has been empowered to authorize or require the type of conduct under antitrust challenge."). Thus, we cannot conclude that Georgia's policy clearly favors asset acquisitions by hospitals regardless of their competitive effects. Accordingly, the appellees' acquisition is not entitled to immunity from the antitrust laws.

Second, the appellees argue that since the consumers in the relevant market are largely sophisticated insurers with significant bargaining power, rather than individuals, it is unlikely that the hospitals that remain in the market after the acquisition is consummated would be able to lessen competition. We agree that "concentration on the buying side of a market does inhibit collusion." *Hospital Corp. of Am. v. FTC,* 807 F.2d 1381, 1391 (7th Cir.1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987). The insurance companies in this market, however, are not truly large buyers; rather, they are third-party payors acting on behalf of individuals, the ultimate consumers. These insurance companies, as a practical matter, could not refuse to reimburse their subscribers because the prices in the relevant market were too high; rather, they would, as always, reimburse their subscribers for necessary medical services and, if the prices remained high, they would pass these increased costs on to the individual consumers. Thus, if the hospitals in the relevant market tacitly colluded, so as not to alert these insurers of their anticompetitive plan, their behavior would likely go unchecked. *Id.* Moreover, given the FTC's strong showing that the proposed acquisition is likely to lessen competition substantially, *see infra* p. 1219, we think that the existence of these sophisticated purchasers in the relevant market, which may inhibit collusion, is insufficient to overcome the FTC's case.

that University Hospital, as a nonprofit entity, would not act anticompetitively was improper. Finally, we agree with the FTC that the equities weigh in favor of granting a preliminary injunction. Therefore, we reverse the district court.

## II.

■ The threshold question we must answer is whether section 7 of the Clayton Act applies to asset acquisitions by nonprofit hospitals. Section 7 provides, in part, that "no person subject to the jurisdiction of the [FTC] shall acquire the whole or any part of the assets of another person ... where ... the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18.[14] Therefore, we must determine whether nonprofit hospitals are subject to the jurisdiction of the FTC for purposes of enforcing the Clayton Act.[15] The appellees argue that the FTC's jurisdiction over corporations is defined by the FTCA, 15 U.S.C. §§ 41–46, 47–58 (1988), the fundamental charter of the FTC. Section 5 of the FTCA, *id.* § 45(a)(2), gives the FTC jurisdiction over corporations; section 4 of the FTCA, *id.* § 44, defines a "corporation" as an entity that is "organized to carry on business for its own profit or that of its members." Thus, the FTC has no jurisdiction to regulate nonprofit, charitable enterprises (i.e., nonprofit enterprises that operate to benefit the public rather than their members, employees, or shareholders). *See Community Blood Bank v. FTC,* 405 F.2d 1011 (8th Cir.1969). University Hospital is a nonprofit, charitable organization that is prohibited by law from operating for the benefit of private

individuals. Therefore, according to the appellees, section 7 is inapplicable to this asset acquisition.

The FTC, on the other hand, argues that its jurisdiction, for purposes of enforcing the Clayton Act, is defined by section 11 of that same act; there is thus no need to turn to the FTCA. Section 11 vests "the authority to enforce compliance with sections [2, 3, 7, and 8 of the Clayton Act] by the persons respectively subject thereto" in five federal agencies:

> in the Interstate Commerce Commission where applicable to common carriers subject to subtitle IV of title 49; in the Federal Communications Commission where applicable to common carriers engaged in wire or radio communication or radio transmission of energy; in the Secretary of Transportation where applicable to air carriers and foreign air carriers subject to the Federal Aviation Act of 1958 ...; in the Board of Governors of the Federal Reserve System where applicable to banks, banking associations, and trust companies; and in the [FTC] where applicable to all other character of commerce.

15 U.S.C. § 21 (1988).[16] According to the FTC, since nonprofit hospitals are not regulated by any of the other agencies listed in section 11, they are an "other character of commerce" and, thus, fall under the FTC's jurisdiction to enforce the Clayton Act. Therefore, section 7 of the Clayton Act applies to asset acquisitions by nonprofit hospitals.

We agree with the FTC. Clearly, Congress did not provide, in section 7, an explicit exemption to nonprofit hospitals for

---

**14.** Section 7 also applies to stock or share capital acquisitions. *See supra* note 2. Many nonprofit entities, like St. Joseph's Hospital, however, have no stock or share capital to acquire. This part of section 7, then, is inapplicable to many acquisitions of nonprofit enterprises, such as the one at issue here. *See United States v. Rockford Memorial Corp.,* 898 F.2d 1278, 1280 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). *But see United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 335–49, 83 S.Ct. 1715, 1726–34, 10 L.Ed.2d 915 (1963) (merger between banks is subject to stock-acquisition clause of section 7, even though in corporate law such merger is asset

acquisition). Of course, if a nonprofit corporation acquired the stock or share capital of another entity, this transaction would fall within section 7's ambit.

**15.** Section 1 of the Clayton Act defines "persons" as all corporations, including nonprofit corporations. *See National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85, 100 n. 22, 104 S.Ct. 2948, 2960 n. 22, 82 L.Ed.2d 70 (1984).

**16.** The remainder of section 11 prescribes the procedures these agencies must use in enforcing the Clayton Act.

asset acquisitions.[17] Nonetheless, the appellees ask us to confer a special dispensation upon them, based on their interpretation of section 7's reference to "the jurisdiction of the [FTC]." Immunity from the antitrust laws, however, is not lightly implied. *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963). In our judgment, section 7's reference to the "jurisdiction of the [FTC]" is best understood as a reference to the limitations set out in section 11 of the same act. Congress, in amending section 7 to its present state, used as a reference point section 11, rather than the FTCA. As the Supreme Court explained in *Philadelphia National Bank* :

> the objective of including the phrase "corporation subject to the jurisdiction of the [FTC]" in § 7 was not to limit the amalgamations to be covered by the amended statute but to make explicit the role of the FTC in administering the section. The predominant focus of the hearings, debates, and committee reports was upon the powers of the FTC. The decisions of this Court which had uncovered the loophole in the original § 7 . . . had not rested directly upon the substantive coverage of § 7, but rather upon the limited scope of the FTC's divestiture powers under § 11 . . . . Thus, the loophole was sometimes viewed as primarily

a gap in the FTC's jurisdiction. . . . Congress in 1950 clearly intended to remove all question concerning the FTC's remedial power over corporate acquisitions, and therefore explicitly enlarged the FTC's jurisdiction.

*Id.* at 346–48, 83 S.Ct. at 1732–33.[18] Congress accomplished this enlargement by amending sections 7 and 11 of the Clayton Act at the same time. Celler–Kefauver Antimerger Act, ch. 1184, 64 Stat. 1125–26 (1950) (amending 15 U.S.C. §§ 18, 21).[19] Thus, section 11 of the Clayton Act evidences Congress' intent to exempt from FTC's enforcement of section 7's asset-acquisition clause only certain entities regulated by other federal agencies; all other entities, including nonprofit hospitals, are subject to section 7. *See United States v. Rockford Memorial Corp.,* 898 F.2d 1278, 1280–81 (7th Cir.), *cert. denied,* ––– U.S. –––, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990) (dicta); P. Areeda & H. Hovenkamp, Antitrust Law ¶ 906, at 797 n. 2 (Supp.1989); Baker, *The Antitrust Analysis of Hospital Mergers and the Transformation of the Hospital Industry,* 51 Law & Contemp. Probs. 93, 112–13 (Spring 1989). *But see United States v. Carilion Health Sys.,* 707 F.Supp. 840, 841 n. 1 (W.D.Va.), *aff'd,* 892 F.2d 1042 (4th Cir.1989); Comment, *Antitrust Challenges to Nonprofit Hospital*

---

**17.** Section 7 provides limited exceptions for certain transactions, including those "duly consummated pursuant to the authority given by the Secretary of Transportation, Federal Communications Commission, Federal Power Commission, Interstate Commerce Commission, the Securities and Exchange Commission ..., the United States Maritime Commission, or the Secretary of Agriculture...."

**18.** The loophole the Court spoke of referred to the absence of the asset-acquisition provision in the original version of the Clayton Act. As originally enacted, section 7 only applied to stock acquisitions. To avoid the constraints of section 7, corporations used asset acquisitions to achieve the same result as stock acquisitions. The Court "uncovered" this loophole when it held that the Clayton Act did not apply to such transactions. *See Arrow–Hart & Hegeman Elec. Co. v. FTC,* 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed. 1007 (1934); *FTC v. Western Meat Co.,* 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405 (1926). In 1950, Congress closed this loophole by amending sections 7 and 11 to allow the FTC to prevent asset

acquisitions that tend substantially to lessen competition.

**19.** Ten years later, Congress reiterated that the FTC's jurisdiction in enforcing the Clayton Act is defined by reference to section 11 of that act. In 1960, Congress debated whether to amend section 7 to include asset acquisitions by banks, which were understood at that time to be excepted from section 7. The Senate explained the reason for this exception as follows:

> Acquisitions of assets were included [in 1950] within [section 7 of the Clayton Act], but only in the case of corporations subject to the jurisdiction of the [FTC] (banks, being subject to the jurisdiction of the Federal Reserve Board for purposes of the Clayton Act *by virtue of section 11 of that act,* were not affected).

S.Rep. No. 196, 86th Cong., 1st Sess. 5 (1959) (emphasis added) (final report on Bank Merger Act of 1960). Subsequently, Congress, in lieu of amending the Clayton Act, enacted the Bank Merger Act of 1960, 12 U.S.C. § 1828(c) (1988).

*Mergers Under Section 7 of the Clayton Act,* 21 Loy.U.Chi.L.J. 1231 (1990); Miles & Philip, *Hospitals Caught in the Antitrust Net: An Overview,* 24 Duq.L.Rev. 489, 664 (1985).[20]

■ The appellees offer no compelling reason why we should borrow section 4 of the FTCA in interpreting section 7 of the Clayton Act, other than that both acts regulate the FTC. We think it is reasonable to infer that Congress intended the FTC's jurisdiction to be greater in enforcing the Clayton Act, which regulates specific types of anticompetitive behavior, than in carrying out its duties under the FTCA, which regulates unfair methods of competition in general. *See Community Blood Bank,* 405 F.2d at 1018 (The Clayton Act "not only make[s] no distinction between business and nonprofit corporations as does the [FTCA], but [it] contain[s] no language whatsoever that would limit jurisdiction to particular types of corporations."). Indeed, given Congress' efforts to define, in the Clayton Act, specific activity harmful to competition, it is likely that it intended expansive and vigorous enforcement of section 7 by the FTC.

■ Furthermore, several factors counsel against the interpretive method appellees advocate. First, in interpreting one section of a statute, it is usually best to refer first to the overall statutory scheme of which the section is a part before turning to other sources, such as other statutes. *See United States v. American*

*Trucking Ass'ns,* 310 U.S. 534, 542–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) ("To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute, particularly in a law drawn to meet many needs of a major occupation."); *cf. Ingersoll–Rand Co. v. McClendon,* —— U.S. ——, ——, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990); *United States v. Ron Pair Enters.,* 489 U.S. 235, 240–43, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989). Thus, to understand section 7, we should first look to the Clayton Act as a whole, particularly section 11. Only if this analysis yields ambiguous results, which it does not here, should we refer to alternative sources.[21]

■ Second, Congress did not limit explicitly, in the Clayton Act itself, the FTC's jurisdiction by reference to some other statute; neither section 7 nor section 11 cite the FTCA as a source for, or limitation on, the FTC's jurisdiction. This is in sharp contrast to Congress' decision to limit, in section 11, the jurisdiction of the Interstate Commerce Commission and the Secretary of Transportation in enforcing the Clayton Act to certain entities as provided by other specified statutes. Moreover, Congress specifically exempted certain transactions, which are regulated by federal agencies other than the FTC, in section 7. *See supra* note 13. Thus, it appears that Con-

---

**20.** Neither *Rockford Memorial Corp.* nor *Carilion Health System* has much precedential value on this issue. The discussion in *Rockford Memorial Corp.* is dicta; the government failed to raise and, therefore, waived, the section 11 argument in that case. *Rockford Memorial Corp.,* 898 F.2d at 1280–81. In *Carilion Health System,* the Fourth Circuit, on appeal, declined, in an unpublished opinion, to decide whether section 7 of the Clayton Act applies to nonprofit hospitals; it simply affirmed the district court on other grounds. *Carilion Health Sys.,* 1989–2 Trade Cas. ¶ 68,859, at 62,513, 62,516 [892 F.2d 1042 (table)] (4th Cir. Nov. 29, 1989).

**21.** As noted above, section 11 provides that the "[a]uthority to enforce compliance with sections [2, 3, 7, and 8 of the Clayton Act] *by the persons respectively subject thereto* is vested ... in the [FTC] where applicable to all ... character of

commerce" not regulated by other specified federal agencies. 15 U.S.C. § 21(a) (emphasis added). The appellees argue that the emphasized language demonstrates that the jurisdiction of the FTC is defined outside of section 11; thus, they argue, reliance on section 11 is illogical. We disagree. As the FTC points out, at the time Congress amended section 11, the enumerated sections of the Clayton Act applied to different kinds of entities: sections 2 and 3 applied to all entities; section 7 only applied to corporations; and section 8 applied to natural persons. Thus, the emphasized language only clarifies that the agencies listed in section 11, including the FTC, may only enforce the different sections of the Clayton Act against the entities subject to them; in other words, Congress did not intend to expand, through section 11, the kinds of entities subject to sections 2, 3, 7, and 8, respectively.

gress intentionally declined to limit the FTC's jurisdiction in enforcing the Clayton Act to the scope of its jurisdiction under the FTCA; if Congress had meant to do otherwise, it could have done so explicitly in section 7 or 11, as it did with other federal agencies.

Finally, the appellees argue that Supreme Court precedent requires us to look to the FTCA, rather than section 11, to determine the FTC's jurisdiction to enforce section 7. In *Philadelphia National Bank*, the Court, on its way to holding that mergers between banks are subject to section 7's stock-acquisition clause, discussed whether pure asset acquisitions by banks are subject to section 7's asset-acquisition clause. The Court stated that "[t]he FTC, under § 5 of the [FTCA], has no jurisdiction over banks. Therefore, if the proposed merger be deemed an assets acquisition, it is not within § 7." *Philadelphia Nat'l Bank*, 374 U.S. at 336, 83 S.Ct. at 1726–27 (citation and footnote omitted); *see also id.* at 344 n. 22, 83 S.Ct. at 1731 n. 22 (referring to FTCA in defining FTC's jurisdiction in enforcing section 7 of Clayton Act). This, argues the appellees, establishes that the FTC's jurisdiction to enforce the Clayton Act is limited to its jurisdiction under the FTCA.

■ The appellees ignore, however, that the Court also considered whether section 11 conferred jurisdiction over banks upon the FTC. *Id.* at 336 n. 11, 83 S.Ct. at 1726 n. 11. The Court held that Congress did not intend in section 11 to expand the FTC's jurisdiction to include banks, which the Federal Reserve Board already regulated. *Id.* ("The exclusion of banks from the FTC's jurisdiction appears to have been motivated by the fact that banks were already subject to extensive federal administrative controls.").[22] In other words, the Court suggested, as we hold today, that section 11 restricts the FTC's jurisdiction in enforcing the Clayton Act to those industries unregulated by other federal agencies. Thus, the lesson, if any, that the dicta in *Philadelphia National Bank* imparts is that the FTC's jurisdiction in enforcing the Clayton Act should be defined expansively; that is, both section 11 and the FTCA define this jurisdiction—the FTCA alone, however, does not limit it.[23]

### III.

■ We now turn to whether the district court properly applied the law to the basically uncontested facts. As stated above, we hold that it did not. Section 13(b) of the FTCA provides that "[u]pon a proper showing that, weighing the equities and considering the [FTC]'s likelihood of ultimate success, such action would be in the public interest ... a preliminary injunction may be granted...." 15 U.S.C. § 53(b). Thus, in determining whether to grant a preliminary injunction under section 13(b), a district court must (1) determine the likelihood that the FTC will ultimately succeed on the merits and (2) balance the equities. *See FTC v. Warner Communications Inc.*, 742

---

**22.** Thus, despite the fact that the Federal Reserve Board had no authority to enforce the Clayton Act against bank mergers, *see Philadelphia Nat'l Bank*, 374 U.S. at 344 n. 22, 83 S.Ct. at 1731 n. 22, the Court declined to categorize banks as an "other character of commerce," thereby subjecting them to the FTC's jurisdiction to enforce the asset-acquisition clause of the Clayton Act, *id.* at 336 n. 11, 83 S.Ct. at 1726 n. 11.

**23.** The appellees also argue that even if the FTC has jurisdiction to enforce section 7 against nonprofit corporations, it cannot enjoin this acquisition under section 13(b) of the FTCA. This argument is based, once again, on the fact that the FTC has no jurisdiction under the FTCA to regulate nonprofit corporations. 15 U.S.C. § 44. We do not accept this limited reading of section 13(b). Section 13(b) authorizes the FTC

to seek injunctive relief against violations of "any provision of law enforced by [it]." To exempt the present acquisition, which the FTC may regulate under section 7 of the Clayton Act, from section 13(b) of the FTCA, would frustrate Congress' clear intent to provide the FTC with a means of effectively enforcing the laws it administers, *FTC v. Exxon Corp.*, 636 F.2d 1336, 1342–43 (D.C.Cir.1980); indeed, once an anticompetitive acquisition is consummated, it is difficult to "unscramble the egg." In our judgment, section 13(b) applies to the FTC's enforcement power under all statutes, not just those contained in the FTCA. Accordingly, we hold that the FTC, to ensure compliance with section 7 of the Clayton Act in this case, properly brought an action for a preliminary injunction under section 13(b) of the FTCA.

F.2d 1156, 1160 (9th Cir.1984). To obtain a preliminary injunction, then, the FTC need not satisfy the traditional equity standard that courts impose on private litigants—the FTC need not prove irreparable harm. *See* H.R.Conf.Rep. No. 624, 93d Cong., 1st Sess. 31 (1973), *reprinted in* 1973 U.S.Code Cong. & Admin.News 2417, 2533; *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C.Cir. 1980).

### A.

■ To show a likelihood of ultimate success, the FTC must "raise[ ] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Warner Communications Inc.*, 742 F.2d at 1162 (quoting *FTC v. National Tea Co.*, 603 F.2d 694, 698 (8th Cir.1979)). Thus, "[o]ur present task is not to make a final determination on whether the proposed [acquisition] violates [s]ection 7, but rather to make only a preliminary assessment of the [acquisition]'s impact on competition." *Id.* To secure a preliminary injunction here, the FTC must demonstrate that it likely will prevail on its section 7 challenge to the proposed acquisition.

■ As its language suggests, section 7 is "designed to arrest in its incipiency ... the substantial lessening of competition from the acquisition by one corporation of the whole or any part of the stock" or assets of a competing corporation. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957). Thus, to satisfy section 7, the government must show a reasonable probability that the proposed transaction would substantially lessen competition in the future. *Warner Communications Inc.*, 742 F.2d at 1160. The government usually makes a prima facie case by showing that the acquisition at issue would produce "a firm controlling an undue percentage share of the relevant market, and [would] result[ ] in a significant increase in the concentration of firms in that market." *Philadelphia Nat'l Bank*, 374 U.S. at 363, 83 S.Ct. at 1741; *see United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120–22, 95 S.Ct. 2099, 2118–19, 45 L.Ed.2d 41 (1975); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982 (D.C.Cir.1990).[24] If the government makes this showing, a presumption of illegality arises. *Id.*

■ To rebut this presumption, the defendant must produce evidence that "show[s] that the market-share statistics [give] an inaccurate account of the acquisition['s] probable effect[ ] on competition" in the relevant market. *Citizens & S. Nat'l Bank*, 422 U.S. at 120, 95 S.Ct. at 2118–19; *see Philadelphia Nat'l Bank*, 374 U.S. at 363, 83 S.Ct. at 1741; *United States v. Waste Management, Inc.*, 743 F.2d 976, 981 (2nd Cir.1984). In so doing, the defendant may rely on "[n]onstatistical evidence which casts doubt on the persuasive quality of the statistics to predict future anticompetitive consequences," such as: "ease of entry into the market, the trend of the market either toward or away from concentration, and the continuation of active price competition." *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1341 (7th Cir.1981). *See generally* P. Areeda & H. Hovenkamp, *supra* p. 1215 ¶¶ 917.1, 919, 920.1, 921, 925, 934, 935, 939 (Supp. 1989); Antitrust Section, American Bar Association, Horizontal Mergers: Law and Policy 162–75, 201–04, 219–63 (Monograph No. 12, 1986). Additionally, the defendant may demonstrate unique economic circumstances that undermine the predictive value of the government's statistics. *See, e.g., United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). "If the defendant successfully rebuts the presumption [of illegal-

---

**24.** Significant market concentration makes it "easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level." *Rockford Memorial Corp.*, 898 F.2d at 1282–83 (quoting *Hospital Corp. of Am.*, 807 F.2d at 1386); *see* *also FTC v. PPG Indus.*, 798 F.2d 1500, 1503 (D.C.Cir.1986) ("where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels").

ity], the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Baker Hughes Inc.*, 908 F.2d at 983; *see also Kaiser Aluminum*, 652 F.2d at 1340 & n. 12.[25]

In the discussion that follows, we analyze whether the FTC has demonstrated that it likely will satisfy its ultimate burden of persuasion—that the proposed acquisition probably would substantially lessen competition. In subpart 1, we discuss the FTC's case, both its prima facie showing of market concentration and the additional evidence that it submitted to bolster this prima facie case. In subpart 2, we discuss the appellees' response to the FTC's case.

### 1.

■■■ The FTC clearly established a prima facie case of anticompetitive effect. The proposed acquisition would significantly increase the concentration of an already highly concentrated market. *See supra* note 12. Following the acquisition, University Hospital would control approximately forty-three percent of the relevant market; three smaller hospitals would share the remainder of the market. These businesses (and these hospitals certainly are businesses), then, theoretically would be able to raise prices and reduce output together without fear that smaller competitors would undermine their anticompetitive plan by expanding their output and slashing prices—there simply would be no other competitors. And, indeed, four businesses

easily could collude to achieve such ends without committing detectable violations of sections 1 or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1988). *See Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1387 (7th Cir.1986), *cert. denied*, 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987).

Added to its prima facie case, the FTC demonstrated that Georgia's certificate of need law—which regulates the addition of hospital services based on the need of the public—is a substantial barrier to entry by new competitors and to expansion by existing ones; in the words of the district court, "the barriers to entry of another into the relevant ... market [or to expansion by existing firms] are as substantial as they could be, barring outright statutory prohibition." Such barriers make concentrated markets more threatening, since there is little chance that other firms (new or old) would be able, in the face of anticompetitive practices, to spur competition.[26]

In fact, the certificate of need law would facilitate an illegal cartel among the hospitals. First,

[s]hould the leading hospitals [in the relevant market] collude, a natural consequence would be the creation of excess hospital capacity, for the higher prices resulting from collusion would drive some patients to shorten their hospital stays and others to postpone or reject elective surgery. If a noncolluding hospital wanted to expand its capacity [or an outsider wanted to enter the market] so that it could serve patients driven off by the high prices charged by the colluding hospitals, the colluders would have not

---

**25.** Conceptually, this shifting of the burdens of production, with the ultimate burden of persuasion remaining always with the government, conjures up images of a tennis match, where the government serves up its prima facie case, the defendant returns with evidence undermining the government's case, and then the government must respond to win the point. In practice, however, the government usually introduces all of its evidence at one time, and the defendant responds in kind. This is particularly true when the government seeks a temporary restraining order or, as here, a preliminary injunction and, thus, time is of the essence.

**26.** The threat of outsiders' entry into a market may deter existing competitors from colluding

if entry barriers are low. *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 532–33, 93 S.Ct. 1096, 1100–01, 35 L.Ed.2d 475 (1973); *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 581, 87 S.Ct. 1224, 1231, 18 L.Ed.2d 303 (1967) (*Clorox*) ("it is clear that the existence of Procter at the edge of the industry exerted considerable influence on the market.... [The] industry was influenced by each firm's predictions of the market behavior of its competitors, actual and potential."). In this case, however, there would not even be a legitimate threat of entry restraining the hospitals because of the restrictions that Georgia's certificate of need law imposes.

only a strong incentive to oppose the grant of a certificate of need but also substantial evidence with which to oppose it—the excess capacity (in the market considered as a whole) created by their own collusive efforts.

*Id.* Consequently, this law would help the hospitals maintain their cartel. Second, since any hospital that wanted to expand its capacity would have to give public notice in advance, it would be difficult for cartel members to "cheat" their co-conspirators (i.e., expand output and lower prices). *Id.* This would help the cartel members enforce their illegal agreement by monitoring each others' behavior.[27]

### 2.

As the above discussion makes clear, the FTC established a strong prima facie case that the proposed acquisition would substantially lessen competition in violation of section 7 of the Clayton Act. Additionally, the FTC bolstered this prima facie case with evidence that substantial barriers to entry into the relevant market exist. To overcome the strong presumption of illegality to which the FTC is entitled, based on its showing, the appellees make three principal arguments, all of which the district court accepted. As we explain below, these arguments, or the appellees' evidence

in support of them, are insufficient to overcome the FTC's case.

### a.

The appellees first assert that St. Joseph is a weak competitor and that this undermines the predictive value of the FTC's market share statistics.[28] They contend that because St. Joseph offers only a limited number of services, its prospects for future success are dim. Therefore, they surmise, the proposed acquisition would not substantially lessen competition; St. Joseph, despite its present market share, is not, and will not be, a meaningful competitor in the relevant market. We disagree.

The appellees cite the Supreme Court's opinion in *General Dynamics* to support their position. 415 U.S. at 486, 94 S.Ct. at 1186. In *General Dynamics*, the Supreme Court held that the market share statistics used by the government to contest a merger were insufficient to sustain its case because, by failing to take into account the acquired firm's long-term contractual commitments, the statistics overestimated the acquired firm's ability to compete in the relevant market in the future. *Id.* at 500–04, 94 S.Ct. at 1195–97; *see also Kaiser Aluminum,* 652 F.2d at 1335–36 (explaining *General Dynamics*). In so holding, the Court stated that the acquired firm's

---

**27.** Moreover, the FTC introduced evidence showing that the appellees, *by their own admissions,* intend to eliminate competition through the proposed acquisition. For example, the appellees, in a report prepared by a joint University Hospital/St. Joseph task force, stated that:

> 1. Due to reduced usage rates ... competition will get keener in the Augusta market, even with an increasing population.
>
> ....
>
> 6. In order to be successful, University Hospital feels that an outright merger with St. Joseph Hospital is most desirable. A merger would accomplish the following:
> a. Reduce competition.

Similarly, University's counsel, in a report submitted in support of University's premerger notification, stated: "[T]he transaction will ... produce substantial welfare-enhancing benefits to consumers.... First, there will be a reduction in cost increasing non-price competition...."

The district court discounted this language as casual references "to a reduction in wasteful

and unnecessary duplication of resources rather than ... [confessions of an] unlawful tendency toward the creation of monopoly or a substantial lessening of competitive factors that would exist in the market place." We need not decide whether the court's characterization of these statements is clearly erroneous because we conclude that even without this evidence, the FTC is entitled to a preliminary injunction.

**28.** The parties agree, as the district court found, that St. Joseph is not a "failing company," and that the appellees are not asserting a "failing company" defense. Under the "failing company" defense, an acquisition that otherwise would violate section 7 is allowed if: (1) the firm being acquired faces a "grave probability of business failure" (i.e., bankruptcy) and (2) there is no less anticompetitive means of avoiding the failure, such as merger with some other firm. *See Citizen Publishing Co. v. United States,* 394 U.S. 131, 136–39, 89 S.Ct. 927, 930–31, 22 L.Ed.2d 148 (1969); *International Shoe Co. v. FTC,* 280 U.S. 291, 302, 50 S.Ct. 89, 93, 74 L.Ed. 431 (1930).

"weakness as a competitor was properly analyzed by the District Court and fully substantiated that court's conclusion that [the acquisition] would not 'substantially ... lessen competition.'" *General Dynamics*, 415 U.S. at 503–04, 94 S.Ct. at 1197; *see also id.* at 507–08, 94 S.Ct. at 1198–99.

■■■ We are not prepared, on the strength of this language, to hold that the acquisition of a "weak company" is absolutely immune from section 7 scrutiny. Rather, we view *General Dynamics* as standing for the unremarkable proposition that a defendant may rebut the government's prima facie case by showing that the government's market share statistics overstate the acquired firm's ability to compete in the future and that, discounting the acquired firm's market share to take this into account, the merger would not substantially lessen competition. *See Hospital Corp. of Am.*, 807 F.2d at 1385; 4 P. Areeda & D. Turner, Antitrust Law ¶ 935b, at 140–41 (1980). The weakness of the acquired firm is only relevant if the defendant demonstrates that this weakness undermines the predictive value of the government's market share statistics.

The acquired firm's weakness, then, is one of many possible factors that a defendant may introduce to rebut the government's prima facie case. *See Warner Communications Inc.*, 742 F.2d at 1164–65; *Kaiser Aluminum*, 652 F.2d at 1339; *National Tea Co.*, 603 F.2d at 700; *United States v. International Harvester Co.*, 564 F.2d 769, 774 (7th Cir.1977) ("the *prima facie* case presented by the Government was rebutted by persuasive evidence, including [the acquired firm's] weakened financial condition"). It is, however, "probably the weakest ground of all for justifying a merger." *Kaiser Aluminum*, 652 F.2d at 1339. Since weak firms are not in grave danger of failure—if so, they would be failing, rather than weak, companies, and the analysis might differ, *see supra* note 28—it is not certain that their weakness "will cause a loss in market share beyond what has been suffered in the past, or that [such weakness] cannot be resolved

through new financing or acquisition by other than a leading competitor." P. Areeda & D. Turner, *supra* p. 1221, ¶ 935b, at 140. Moreover, "[t]he acquisition of a financially weak company in effect hands over its customers to the financially strong, thereby deterring competition by preventing others from acquiring those customers, making entry into the market more difficult." *Kaiser Aluminum*, 652 F.2d at 1339; *id.* at 1341 ("History records and common sense indicates that the creation of monopoly and the loss of competition involve the acquisition of the small and the weak by the big and the strong.").

■■■ Therefore, to ensure that competition and consumers are protected, we will credit such a defense only in rare cases, when the defendant makes a substantial showing that the acquired firm's weakness, which cannot be resolved by any competitive means, would cause that firm's market share to reduce to a level that would undermine the government's prima facie case. In the present case, the appellees have failed to make such a showing, and the district court's findings to the contrary are clearly erroneous. St. Joseph is fiscally sound at the present time—indeed, it is presently enjoying the most profitable year in its history. In the district court, however, the appellees speculated, based on ambiguous evidence, that St. Joseph would not be an effective competitor in the future. In reaching this conclusion, they did not analyze St. Joseph's ability to adjust to changing market conditions nor did they explain why St. Joseph, which competes effectively with University Hospital in the relevant market for several services, *see supra* note 11, would not remain competitive in these service areas in the future. Furthermore, the appellees did not consider whether the FTC's market share statistics sufficiently account for St. Joseph's alleged shortcomings or whether, adjusting these statistics, the acquisition would still raise antitrust concerns. Therefore, we conclude that the appellees have failed to show that, because of St. Joseph's financial prospects, the FTC's prima facie case does not accurately reflect the proposed acquisition's likely effect on future competition.

b.

The appellees argue that the proposed acquisition would generate significant efficiencies and, therefore, would not substantially lessen competition. The FTC responds that the law recognizes no such efficiency defense in any form. We conclude that in certain circumstances, a defendant may rebut the government's prima facie case with evidence showing that the intended merger would create significant efficiencies in the relevant market. Here, however, the appellees have failed to introduce sufficient evidence to demonstrate that their transaction would yield any efficiencies, and the district court's factual finding to the contrary is clearly erroneous. Accordingly, the appellees may not rely on an efficiency defense.

The Supreme Court stated in *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (*Clorox*), that "[p]ossible economies cannot be used as a defense to illegality" in section 7 merger cases. *Id.* at 579, 87 S.Ct. at 1224; *see also Philadelphia Nat'l Bank*, 374 U.S. at 371, 83 S.Ct. at 1745 ("We are clear … that a merger the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 344, 82 S.Ct. 1502, 1534, 8 L.Ed.2d 510 (1962). Courts and scholars have debated the meaning of this precedent. Some argue that the Court completely rejected the use of efficiency evidence by defendants in section 7 cases. *See RSR Corp. v. FTC*, 602 F.2d 1317, 1325 (9th Cir.1979) ("RSR ar-

gues that the merger can be justified because it allows greater efficiency of operation. This argument has been rejected repeatedly."), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980); Fisher & Lande, *Efficiency Considerations in Merger Enforcement*, 71 Calif. L.Rev. 1580, 1595 (1983). Others posit that the Court merely rejected the use of insufficient or speculative evidence to demonstrate efficiencies; a limited efficiency defense to the government's prima facie case, they argue, remains available. *See* P. Areeda & D. Turner, *supra* p. 22, ¶ 941b, at 154 ("To reject an economies defense based on mere possibilities does not mean that one should reject such a defense based on more convincing proof."); Murris, *The Efficiency Defense Under Section 7 of the Clayton Act*, 30 Case W.Res.L.Rev. 381, 412–13 (1980).

It is clear that whether an acquisition would yield significant efficiencies in the relevant market is an important consideration in predicting whether the acquisition would substantially lessen competition.[29] Market share statistics, which the government uses to make out a prima facie case under section 7, are not an end in themselves; rather, they are used to estimate the effect an intended transaction would have on competition. Thus, evidence that a proposed acquisition would create significant efficiencies benefiting consumers is useful in evaluating the ultimate issue—the acquisition's overall effect on competition. We think, therefore, that an efficiency defense to the government's prima facie case in section 7 challenges is appropriate in certain circumstances.[30]

---

29. Of course, once it is determined that a merger *would* substantially lessen competition, expected economies, however great, will not insulate the merger from a section 7 challenge. *See Clorox*, 386 U.S. at 579, 87 S.Ct. at 1231 ("Congress was aware [when it enacted section 7] that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition."); *Philadelphia Nat'l Bank*, 374 U.S. at 371, 83 S.Ct. at 1745–46 ("Congress determined to preserve our traditionally competitive economy. It therefore proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must

assume, that some price might have to be paid.").

30. It is unnecessary for us to define the parameters of this defense now; as we explain *infra*, the appellees failed to demonstrate that the proposed acquisition would generate significant efficiencies. We note, however, that it may further the goals of antitrust law to limit the availability of an efficiency defense, even when a defendant can demonstrate that its proposed acquisition would produce significant efficiencies. For example, it might be proper to require proof that the efficiencies to be gained by the acquisition cannot be secured by means that

We recognize, however, that it is difficult to measure the efficiencies a proposed transaction would yield and the extent to which these efficiencies would be passed on to consumers. *See* R. Bork, *supra* note 30, at 127; R. Posner, *supra* note 30, at 112 ("The measurement of efficiency ... [is] an intractable subject for litigation."); Fisher & Lande, *supra* p. 26, 1670–77; *see also* U.S. Dep't of Justice, Merger Guidelines § V.A., 4 Trade Reg. Rep. (CCH) ¶ 13,102, at 20,542 (1982) (claims about expected efficiency gains are "easier to allege than to prove"); *cf.* L. Sullivan, *supra* note 30, § 204, at 631. Moreover, it is difficult to calculate the anticompetitive costs of an acquisition against which to compare the gains realized through greater efficiency; such a comparison is necessary, though, to evaluate the acquisition's total competitive effect. Because of these difficulties, we hold that a defendant who seeks to overcome a presumption that a proposed acquisition would substantially lessen competition must demonstrate that the intended acquisition would result in significant economies and that these economies ultimately would benefit competition and, hence, consumers.[31] As Justice Harlan, concurring in *Clorox,* explained: "Economies cannot be premised solely on dollar figures, lest accounting controversies dominate § 7 proceedings. Economies employed in defense of a merger must be shown in what econo-

mists label 'real' terms." 386 U.S. at 604, 87 S.Ct. at 1243. To hold otherwise would permit a defendant to overcome a presumption of illegality based solely on speculative, self-serving assertions.

The appellees here have not presented sufficient evidence to support their claim that the intended acquisition would generate efficiencies benefiting consumers. The district court, in finding that the proposed acquisition would result in a "number of efficiencies," admitted that its finding was based on the appellees' "speculation." The appellees simply concluded that the intended acquisition would reduce "unnecessary duplication" between University Hospital and St. Joseph; they then approximated, in dollars, the savings these efficiencies would produce. They did not specifically explain, however, how these efficiencies would be created and maintained. In the end, the court conceded that "no one can tell at this point what all of [the efficiencies] are or are not." Clearly, the district court's conclusion is not well grounded *in fact;* while the proposed acquisition *may* produce significant economies, the appellees simply failed to demonstrate this.[32] Therefore, although we hold that an efficiency defense (the scope of which we do not discuss here, *see supra* note 30) may be used in certain cases to rebut the government's prima facie showing in a section 7 challenge, the appellees may not rely on this defense because they failed to demon-

inflict less damage to competition, such as internal expansion or merger with smaller firms. For various suggestions on the proper scope of an efficiency defense, see Murris, *supra* p. 26, 426–31 (advocating absolute efficiency defense); P. Areeda & D. Turner, *supra* p. 1221, ¶¶ 939–62 (advocating partial defense limited to types of efficiencies); L. Sullivan, Handbook of the Law of Antitrust § 204, at 631 (1977) (advocating partial defense limited only by evidentiary standard); Rogers, *The Limited Case for an Efficiency Defense in Horizontal Mergers,* 58 Tul.L.Rev. 503, 521–25, 528 (1983) (advocating partial defense for merger between two small firms in market dominated by large firms). Some scholars advocate placing the efficiency issue before enforcement agencies rather than courts. *See, e.g.,* Williamson, *Economies as an Antitrust Defense Revisited,* 125 U.Pa.L.Rev. 699, 729–31 (1977) (proposing that the Justice Department and the FTC consider efficiencies but not the courts). Others have suggested that enforce-

ment agencies simply take efficiencies into account by increasing the level of market concentration at which a merger is challenged, rather than engaging in case-by-case weighing of efficiencies. Fisher & Lande, *supra* p. 1222, at 1670–77; R. Bork, The Antitrust Paradox: A Policy at War with Itself 129 (1978); R. Posner, Antitrust Law: An Economic Perspective 112–13 (1976).

**31.** The Department of Justice and the FTC, in deciding whether to challenge a merger, require the same threshold showing. *See* Merger Guidelines, *supra* note 12, § 3.5, ¶ 13,103, at 20,564.

**32.** Nor did the appellees compare the benefits they expect to realize from the alleged efficiencies with the costs the intended acquisition may exact on competition. It is difficult, then, to conclude with any reliability that the acquisition ultimately would aid, rather than hinder, competition and consumers.

strate that their proposed acquisition would yield significant economies.

### c.

Finally, the appellees argue, as the district court held, that University Hospital's nonprofit status supports their position that the proposed acquisition would not result in substantially less competition. We disagree.

 While "[d]ifferent ownership structures might reduce the likelihood of collusion, ... this possibility is conjectural." *Hospital Corp. of Am.*, 807 F.2d at 1390. Indeed, the Supreme Court has rejected the notion that nonprofit corporations act under such a different set of incentives than for-profit corporations that they are entitled to an implicit exemption from the antitrust laws. *See National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 100 n. 22, 104 S.Ct. 2948, 2960 n. 22, 82 L.Ed.2d 70 (1984). As the Seventh Circuit explained:

> We are aware of no evidence—and the [appellees] present none, only argument—that nonprofit suppliers of goods or services are more likely to compete vigorously than profit-making suppliers.... If the managers of nonprofit enterprises are less likely to strain after that last penny of profit, they may be less prone to engage in profit-maximizing collusion but by the same token less prone to engage in profit-maximizing competition.

*Rockford Memorial Corp.*, 898 F.2d at 1285. Thus, the nonprofit status of the acquiring firm will not, by itself, help a defendant overcome the presumption of illegality that arises from the government's prima facie case.

 The appellees argue that University Hospital's prior history of service to the public and procompetitive behavior, added to its nonprofit status, removes their argument from the realm of speculation. We cannot agree. University Hospital's business decisions are not mandated by law; rather, its governing body is free to decide where to set prices and output. While University Hospital's prior practices may

suggest its future conduct, such evidence has limited probative value. The appellees' self-serving declarations simply do little to undermine the impressive evidence the FTC has introduced to make its case. Furthermore, although public scrutiny may reduce University Hospital's ability to commit undetected violations of the antitrust laws, it would not eliminate altogether the risk that it might act anticompetitively. For example, while public pressure might inhibit it from raising prices, "similar pressure might inhibit [it] from expanding capacity to take on additional patients attracted by lower prices." *Hospital Corp. of Am.*, 807 F.2d at 1391. Finally, we note that the proposed acquisition would make it easier for the three remaining hospitals in the relevant market—two of which are for-profit entities—to collude. Accordingly, we conclude that the district court erred in relying on this argument to rebut the FTC's prima facie case.

### d.

Therefore, we conclude, based on the evidence presented to the district court, that the FTC has demonstrated that it likely will prevail in showing that the proposed acquisition would substantially lessen competition. The FTC's statistical evidence made out a strong prima facie case. The FTC bolstered its case by showing that a substantial barrier to entry exists in the relevant market. The appellees simply failed to introduce sufficient evidence to undermine the FTC's position.

### B.

Now we must balance the equities to decide whether an injunction should issue. The district court, in concluding that the equities weighed against issuing the injunction, relied on both its perception that the acquisition would foster competition and its belief that delaying the acquisition would harm St. Joseph, HCC, University and, thus, the public they serve. As we demonstrate above, the district court erred in concluding that the acquisition would foster competition; rather, it is likely that it would substantially lessen competition.

Therefore, we must decide whether the harm St. Joseph, HCC, and University would suffer if the acquisition is delayed will harm the public more than if the injunction is not issued. Weighing these equities, we conclude that the injunction should issue.

The principal equity weighing in favor of issuance of the injunction is the public's interest in effective enforcement of the antitrust laws. These laws, as we have discussed, are intended to safeguard competition and, hence, consumers. "A denial of a preliminary injunction would preclude effective relief if the [FTC] ultimately prevails and divestiture is ordered." *Warner Communications Inc.*, 742 F.2d at 1165. A decision not to issue the injunction, then, would frustrate the FTC's ability to protect the public from anticompetitive behavior. Since we conclude that it is likely that the proposed acquisition would substantially lessen competition, the appellees face a difficult task in justifying the nonissuance of a preliminary injunction.

▮▮▮▮▮ To overcome this factor, the appellees point to the cost that delaying this transaction would exact on St. Joseph, HCC, and University. While it is proper to consider private equities in deciding whether to enjoin a particular transaction, we must afford such concerns little weight, lest we undermine section 13(b)'s purpose of protecting the "public-at-large, rather than individual private competitors." *National Tea Co.*, 603 F.2d at 697 n. 4; *see also Warner Communications Inc.*, 742 F.2d at 1165. *But see FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1346 (4th Cir. 1976) (Winter, J., sitting alone) (concluding that private equities "are not proper considerations for granting or withholding injunctive relief under § 13(b)"). No doubt many private injuries result when a transaction is enjoined, particularly on the eve of its consummation; these injuries alone, however, do not outweigh the injury the public suffers from anticompetitive practices.

The appellees' attempt to convert St. Joseph's and HCC's private injuries into public costs is of no avail. The appellees argue that if the acquisition is enjoined, St. Joseph's viability would be threatened; this would jeopardize St. Joseph's valuable service to the public as a charitable organization, as well as HCC's ability to foster new charitable programs. If the acquisition is allowed, they contend, St. Joseph, in effect, would remain open and HCC would be able to divert its resources to unmet public needs. The appellees, however, do not argue that St. Joseph is, at the present time, in grave danger of failing; thus, their speculation that St. Joseph might collapse is of little value. Furthermore, the FTC only asks for a preliminary injunction; if the appellees can demonstrate the legality of the proposed acquisition to the FTC or, ultimately, the court of appeals, the acquisition will take place. We do not think that this delay, in and of itself, will spell disaster for St. Joseph or grave harm to the public. Rather, we think the public will be best served by enjoinment of this acquisition pending extensive analysis of its competitive effect. Therefore, we conclude that the equities weigh in favor of issuing a preliminary injunction.

## IV.

To summarize, we conclude that the FTC is entitled to a preliminary injunction in this case to prevent the appellees from consummating the proposed asset acquisition. The FTC, which we hold has jurisdiction to bring this action, demonstrated that it likely will prevail in its section 7 challenge. It made a strong prima facie showing that the proposed acquisition would substantially lessen competition and buttressed this prima facie case with evidence that there is a substantial barrier to entry into the relevant market. The appellees introduced insufficient evidence to overcome the FTC's case; they failed to show either that the acquisition of St. Joseph would not lessen competition because it is a weak competitor, or that the proposed acquisition would generate significant economies, offsetting the competitive costs of the acquisition. Moreover, we hold that University Hospital's nonprofit status does not demonstrate that it would continue to

act procompetitively after the acquisition is consummated. Finally, the FTC showed that the equities favor issuing this injunction. Therefore, we VACATE the district court's order denying the FTC's request for a preliminary injunction and REMAND the case, directing the district court to issue the preliminary injunction.

IT IS SO ORDERED.